**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 14 2001**

**PATRICK FISHER**
**Clerk**

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

In re: RICKIE L. SIEGFRIED,

Debtor,

J.M. MANGUM, doing business as
J.M. Mangum Co.,

Plaintiff-Appellee,

v.

RICKIE L. SIEGFRIED,

Defendant-Appellant.

No. 00-1122
(D.C. No. 98-M-2234)
(D. Colo.)

ORDER AND JUDGMENT *

Before **BRISCOE** , **ANDERSON** , and **MURPHY** , Circuit Judges.

After examining the briefs and appellate record, this panel has determined

unanimously that oral argument would not materially assist the determination

---

\* This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

of this appeal. See Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

Defendant-appellant Rickie L. Siegfried appeals from the district court's order affirming a final judgment entered by the bankruptcy court, declaring that a debt owed by Siegfried to plaintiff-appellee J.M. Mangum was not discharged pursuant to 11 U.S.C. § 523(a)(4). We affirm.

FACTS

On March 31, 1994, Siegfried Construction, Inc., acting through its president Rickie L. Siegfried, entered into a construction and purchase agreement with Stephen L. Danielski and Marnie P. Danielski (the "Danielskis"). In the agreement, Siegfried Construction agreed to construct a residence for the Danielskis on a lot located at 295 Berthoud Trail, Broomfield, Colorado (the "Property"). The Danielskis provided Siegfried Construction with $55,000 in start-up money for the project.

At the time the agreement was signed, Siegfried and his wife, Michelle Y. Siegfried, owned the Property. On April 29, 1994, the Siegfrieds quitclaimed the lot to Siegfried Construction. Siegfried Construction then granted a deed of trust to the Bank of Boulder encumbering the Property.

The Bank of Boulder provided Siegfried Construction with a construction loan in the amount of $380,000. These funds were placed in a checking account

owned by Siegfried Construction.  The first draw on the account took place on May 4, 1994, when Seigfried Construction paid the Siegfrieds $105,900 for the purchase price of the lot.

On November 10, 1994, Siegfried Construction granted a second deed of trust to the Bank of Boulder encumbering the Property to secure an additional loan in the amount of $75,000.  Draws from these sums were used to pay suppliers, subcontractors and the general operating expenses of Siegfried Construction.

Closing on the Property occurred in February 1995.  The Danielskis purchased the Property for $565,393.62.  Siegfried Construction received a check for net proceeds of $15,363.21.  In connection with the closing, Rickie L. Siegfried executed and delivered an indemnity and affidavit as to debts, liens, and possession verifying that all labor and materials in the construction of the residence on the Property had been paid in full.

In reality, however, several materialmen and subcontractors, including Mangum, remained unpaid.  Mangum had been paid for his work in painting the interior of the residence, but remained unpaid for the exterior painting.  He sued and obtained a default judgment of $12,238.15 against Siegfried and Siegfried Construction, which remains unpaid.

The net proceeds paid to Siegfried Construction at closing were used for partial payment of outstanding debts on the project. The project resulted in a loss to Siegfried Construction, however, and Siegfried filed this bankruptcy as a result.

Mangum filed a complaint in the bankruptcy court, seeking to prevent dischargeability of the debt owed to him. The bankruptcy court conducted a bench trial at which both Siegfried and Mangum testified. After the parties submitted written closing arguments, the bankruptcy court concluded that Siegfried's debt to Mangum was not discharged, because Siegfried, who controlled Siegfried Construction, had misapplied trust funds while acting in a fiduciary capacity for Mangum. The district court affirmed this decision.

In this appeal, Siegfried contends that he did not misapply trust funds and that the debt should therefore be discharged. Mangum elected not to file an response brief.

## ANALYSIS

Section 523(a)(4) provides in pertinent part that "[a] discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt . . . for fraud or defalcation while acting in a fiduciary capacity." Under § 523(a)(4), Mangum had to establish two elements to prevent the discharge of Siegfried's debt: first, that a fiduciary relationship

existed between Siegfried and Mangum, and second, that the debt was attributable to fraud or defalcation committed by Siegfried in the course of that fiduciary relationship. Fowler Brothers v. Young (In re Young), 91 F.3d 1367, 1371 (10th Cir. 1996). We review de novo whether these two elements were established, id., keeping in mind that "exceptions to discharge are to be narrowly construed" and doubts resolved in the debtor's favor, Bellco First Fed. Credit Union v. Kaspar (In re Kaspar), 125 F.3d 1358, 1361 (10th Cir. 1997). As we read them, Siegfried's arguments primarily target the second element of the analysis; however, we will discuss each element separately.

1. Existence of trust relationship

While "[t]he existence of a fiduciary relationship under § 523(a)(4) is determined under federal law," state law is relevant to this inquiry. In re Young, 91 F.3d at 1371. Under applicable federal principles, "an express or technical trust must be present for a fiduciary relationship to exist under § 523(a)(4)." Id. The Colorado construction lien statute creates such a trust.

Section 38-22-127(1) of the Colorado Revised Statutes provides:

All funds disbursed to any contractor or subcontractor under any building, construction, or remodeling contract or on any construction project shall be held in trust for the payment of the subcontractors, laborer or material suppliers, or laborers who have furnished laborers, materials, services, or labor, who have a lien, or may have a lien, against the property, or who claim, or may claim, against a principal and surety under the provisions of this article and for which such disbursement was made.

-5-

This statute plainly creates a fiduciary relationship for § 523(a)(4) purposes. It expressly designates the funds received by the contractor as trust funds to be held for payment to subcontractors. See Woodworking Enters., Inc. v. Baird (In re Baird), 114 B.R. 198, 202-03 (9th Cir. BAP 1990) (discussing effect on dischargeability of wording of various types of construction lien statutes).

The bankruptcy court further determined that Siegfried controlled the finances of Siegfried Construction, and was therefore personally responsible under state law as a fiduciary to Mangum. See Alexander Co. v. Packard, 754 P.2d 780, 782 (Colo. Ct. App. 1988) (stating contractor's vice president, who controlled its finances, was "charged with knowledge of the relationship of trust and confidence" which the statute placed on the contractor and on himself, and was therefore personally liable for debt caused by contractor's failure to pay its suppliers). Siegfried does not challenge this finding on appeal.

2. Debt attributable to fraud or defalcation

Seigfried mounts a vigorous attack on Mangum's showing on the second element of the analysis: that the debt to Mangum is attributable to a fraud or defalcation that occurred in the course of the fiduciary relationship. The testimony at trial centered on two sums of money that Mangum contended Siegfried should have reserved for payment to Mangum, but did not: the $105,900 that Siegfried Construction paid Siegfried for the lot, and the $15,363.21 that

Siegfried Construction received at closing. We will focus, as Siegfried does, primarily on the $105,900 lot payment.

Siegfried contends that the $105,900 that Siegfried Construction paid him for the lot was not subject to the trust created by the lien statute. He advances two arguments in support of this contention. First, Siegfried notes that the statute requires that funds disbursed to a contractor be held for the benefit of "laborers who <u>have</u> furnished laborers, materials, services, or labor." Colo. Rev. Stat. § 38-22-127(1) (emphasis added). Use of the past tense in the phrase "have furnished," he contends, means that a contractor who receives funds at the beginning of a project need not hold them in trust for the payment of work to be performed in the future.

The phrase "have furnished" situates the furnishing of work or materials in time with reference to some later event. Siegfried contends that the later event is the disbursement of funds to the contractor. We conclude, however, that the "later event" is actually completion of the project.

Under Siegfried's reading of the statute, a contractor who received funds for a project at its outset and squandered them before the subcontractors began their work would have no trust responsibilities with regard to the dissipated

funds. [1] This is inconsistent with Colorado case law, which holds that the trust is imposed to protect subcontractors who perform work until the construction project (and the purpose of the trust) has been completed. See, e.g., Flooring Design Assocs., Inc. v. Novick, 923 P.2d 216, 219 (Colo. Ct. App. 1995) (rejecting application of definition of "disburser" contained in related statute to § 38-22-127 on grounds that definition would "defeat the utility of the mechanics' lien statute for the last subcontractors on a job"); People v. Collie, 682 P.2d 1208, 1210 (Colo. Ct. App. 1983) (stating that purpose of § 38-22-127 "is to protect homeowners, laborers, and materialmen from dishonest or profligate contractors by requiring all contractors to hold in trust their customers' advance payments received if any independent laborers or materialmen will be necessary to complete a particular job") (emphasis added). We conclude that the statute is intended to protect contractors who perform work until the project's completion; Siegfried's argument that it protects only those who perform work prior to the disbursement of funds lacks merit. [2]

---

[1] It might be argued that this is unlikely to occur in practice because in most instances, the lender retains some control of the funds through the use of draw requests for work done in completion of the project. Nevertheless, a contractor may receive funds, such as start-up capital from a home buyer, which are not monitored and which he could squander without paying contractors.

[2] This reading of the statute also defeats Siegfried's sub-argument that Mangum cannot rely on the statute because he did not have, and could not have, a lien on the property prior to the time Siegfried was paid the $105,000. As we

(continued...)

-8-

Siegfried's second argument relies on the last phrase of § 38-22-127(1): "for which such disbursement was made." Siegfried argues that the Bank of Boulder intended the $105,900 disbursement to pay for the land, not to pay subcontractors, and that the disbursement was therefore not made "for" the benefit of subcontractors.

"[F]or a subcontractor to avail itself of § 38-22-127, it need not be shown that the disburser of funds specifically intended . . . the disbursements to be allocated for the payment of subcontractors." Novick, 923 P.2d at 220. Indeed, "for which" as it is used in this statute most likely does not refer to subcontractors at all; instead, it refers to the project "for which" disbursements are made. Any other reading incorporates a requirement that the disburser intend that subcontractors be paid. The Colorado Court of Appeals rejected such a requirement in Novick. Moreover, such a reading would allow a borrower and lender to enter into a private agreement between themselves permitting the borrower to use the borrowed money for purposes other than the payment of

---

2(...continued)
have seen, one purpose of the lien statute is to impose a trust on funds advanced to contractors in order to protect laborers and materialmen who complete their work after the funds are advanced. The $105,000 advance falls within this category, even though it was disbursed prior to the time that Mangum could have filed a lien.

subcontractors. We find no such purpose reflected in the statute and therefore reject this argument as well.

Siegfried's last argument is that Siegfried Construction permissibly spent a portion of the remaining funds from the bank loans on payment of general operating expenses, and that such payment did not constitute a per se misapplication of funds. In light of proof that Siegfried Construction disbursed trust funds well in excess of Mangum's claim to Siegfried for payment of the lot, however, this argument lacks merit.

Moreover, nothing in the Colorado lien statute suggests that a contractor is entitled to carve out a privileged portion of the trust fund for its own expenses, to the detriment of subcontractors; rather, the contractor is responsible for paying the subcontractors and meeting its own expenses from the funds disbursed. In the absence of a showing that all the trust funds were used to pay subcontractors or to satisfy the owner's obligations on the project, cf. People v. Erickson, 695 P.2d 804, 805-06 (Colo. Ct. App. 1984) (permitting such a defense in criminal prosecution for theft based on § 38-22-127), which was not made here, the insufficiency of the funds to meet the contractor's expenses is not a defense. Upon a de novo review of the record, we conclude that Mangum established that Siegfried's debt to him was attributable to fraud or defalcation in the course of a fiduciary relationship.

The judgment of the United States District Court for the District of

Colorado is   AFFIRMED.


Entered for the Court


Mary Beck Briscoe
Circuit Judge