AC EXCAVATING, INC., a Colorado corporation, Plaintiff–Appellant,

v.

Donald A. YALE, Defendant–Appellee.

No. 09CA2184.

Colorado Court of Appeals, Div. VII.

Sept. 2, 2010.

Craig D. Johnson & Associates, P.C., Craig D. Johnson, Henry A. Sand, Broomfield, Colorado, for Plaintiff–Appellant.

Ireland Stapleton Pryor & Pascoe, PC, Timothy G. Atkinson, Kelley A. Bergelt, Denver, Colorado, for Defendant–Appellee.

Opinion by Judge LICHTENSTEIN.

Plaintiff, AC Excavating, Inc., appeals the trial court's judgment in favor of defendant, Donald A. Yale, on an alleged violation of the Trust Fund Statute, section 38–22–127, C.R.S.2009, and the civil theft statute, section 18–4–401, C.R.S.2009. We reverse and remand.

## I. Background

This case primarily involves interpretation of Colorado's Trust Fund Statute, section 38–22–127. Specifically, does the Trust Fund Statute limit the source or intended use of funds that must be held in trust for the payment of subcontractors?

### A. Antelope Development, LLC

In the late 1990s, Antelope Development, LLC (Antelope) began developing the Antelope Hills Subdivision, a residential golf course community in Bennett, Colorado. At that time, Keystone Development, LLC, managed Antelope. Antelope performed work on the development's home lots and, in turn, formed and managed another entity, Antelope Hills Golf Course LLC (Antelope GC), to build the golf course.

Antelope received initial financing through construction loans from First National Bank of Colorado. In 2003, when First National opted not to renew the loans, Horizon Bank (now Mile High Bank) replaced the loans. The Horizon loan reached its lending limit in early 2004.

In 2005, due to mounting financial problems, Antelope GC sold the golf course to Ironwood Golf Properties of Colorado, LLC. A term of the sale agreement required Antelope to construct a retention pond on the property after the closing date (the Pond Project). In early 2006, AC Excavating entered into an oral agreement with both Keystone and Antelope to perform work on the Pond Project. AC Excavating ultimately received $150,000 of the $190,680.30 it charged on the Pond Project, leaving unpaid charges of $40,680.30.

In mid–2006, AC Excavating entered into a separate oral agreement with both Keystone and Antelope to perform remedial grading work on the development's residential lots (the Coxsey Project). AC Excavating did not receive any of the $7,707.50 it charged on the Coxsey Project.

AC Excavating's unpaid invoices thus amounted to $48,387.80.

### B. Donald Yale

Yale was a 44% shareholder in Antelope. On June 30, 2006, Yale replaced Keystone as the manager of Antelope, and became responsible for all financial decisions. When Yale assumed the role of manager, he learned that Antelope's single bank account carried a balance of just under $100,000, but unpaid invoices on the Pond Project alone amounted to more than $250,000.

During the following six months, Yale personally loaned Antelope $157,500. Antelope applied proceeds from Yale's loans to both general business expenses and some of the outstanding subcontractor invoices.

In late 2006, with Antelope's assets depleted and multiple invoices left unpaid, Yale gave up on Antelope and foreclosed on a series of municipal bonds held as collateral for loans he had made to Antelope before assuming the role of sole manager. Yale withdrew $50,000 from the Antelope account to cover the interest on the municipal bonds.

AC Excavating filed a complaint against Yale alleging violations of the trust fund and civil theft statutes. Following a bench trial, the trial court entered judgment in Yale's favor. AC Excavating appeals.

## II. Standard of Review

We review de novo whether the trial court applied the correct legal standard in making its findings. *People in Interest of J.R.T.*, 55 P.3d 217, 219 (Colo.App.2002), *aff'd sub nom. People v. Martinez*, 70 P.3d 474 (Colo.2003); *see also People v. Richardson*, 58 P.3d 1039, 1048 (Colo.App.2002) ("A determination of the proper legal standard and application of that standard to particular facts is a question of law.").

Statutory interpretation presents a question of law, which we review de novo. *Smith v. Executive Custom Homes, Inc.*, 230 P.3d 1186, 1189 (Colo.2010) (citing *Spahmer v. Gullette*, 113 P.3d 158, 162 (Colo.2005)). When interpreting a statute, we strive to adopt an interpretation that best effectuates the legislative purpose. *Id.* If the plain language of a statute "is clear and the intent of the General Assembly may be discerned with certainty, we need not resort to other rules of statutory interpretation." *Bd. of County Comm'rs v. ExxonMobil Oil Corp.*, 192 P.3d 582, 585 (Colo.App.2008) (quoting *W. Fire Truck, Inc. v. Emergency One, Inc.*, 134 P.3d 570, 573 (Colo.App.2006)), *aff'd*, 222 P.3d 303 (Colo.2009).

### III. The Trust Fund Statute

AC Excavating contends the trial court erred in narrowly interpreting the Trust Fund Statute. We agree and accordingly, we reverse the judgment and remand the case for further proceedings.

### A. Applicable Law

Section 38–22–127(1), C.R.S.2009, provides:

*All funds disbursed to any contractor or subcontractor under any building, construction, or remodeling contract or on any construction project shall be held in trust for the payment of the subcontractors,* laborer or material suppliers, or laborers who have furnished laborers, materials, services, or labor, who have a lien, or may have a lien, against the property, or who claim, or may claim, against a principal and surety under the provisions of this article and *for which such disbursement was made.*

(Emphasis added.)

■ The General Assembly's purpose and intent behind the statute is "to protect homeowners, laborers, and providers of construction materials from dishonest or profligate contractors." *Flooring Design Assocs., Inc. v. Novick*, 923 P.2d 216, 219 (Colo.App.1995) (*Novick*). To meet this purpose, the statute imposes duties on the contractors to see that the subcontractors are paid. *Id.*

■ A contractor breaches the statutory trust relationship by diverting the trust funds from the suppliers and laborers on the project to other corporate obligations. *Novick*, 923 P.2d at 221; *Alexander Co. v. Packard*, 754 P.2d 780, 782 (Colo.App.1988). Unless and until the suppliers and laborers are paid in full, the contractor cannot use any of the funds on a project to pay corporate overhead, compensation, or put them to any other use. *In re Gamboa*, 400 B.R. 784, 790 (Bankr.D.Colo.2008); *see First Commercial Corp. v. First Nat'l Bancorporation, Inc.*, 572 F.Supp. 1430, 1434–35 (D.Colo.1983) (because the clear policy underlying the Trust Fund Statute is that laborers and suppliers of materials in construction projects are to be paid, "[a]n unsecured supplier claiming an interest under this Act takes priority over a prior perfected security interest in all present and future accounts receivable and proceeds of accounts.").

■ A natural person in complete control of the finances and financial decisions of an entity, including a merchant-homebuilder entity, is personally liable if that entity violates the Trust Fund Statute. *See, e.g., Novick*, 923 P.2d at 221; *Alexander Co.*, 754 P.2d at 782; *Gamboa*, 400 B.R. at 792.

### B. Analysis

AC Excavating contends the trial court erred in narrowly interpreting the Trust Fund Statute to conclude that Yale's loans to Antelope did not fall under the Trust Fund Statute because his loans were not construction loans, but rather were general purpose "survival loans" for the company. We agree the court erroneously interpreted the statute, and therefore we reverse the judgment and remand the case for further proceedings.

### 1. The Source of Disbursements on a Project

■ AC Excavating contends that the trial court erred in construing the Trust Fund Statute's phrase "all funds disbursed to any contractor ... on any construction project" as limited to construction loans. We agree.

Reading the plain language of the statute to discern the legislative intent, *see ExxonMobil*, 192 P.3d at 585, we observe that the statute does not limit the source of funds disbursed on the construction project to con-

struction loans only. Rather, the statute employs the words "all funds disbursed."

In *Novick*, a division of this court recognized that, "[b]y its language [the Trust Fund Statute] extends to 'all funds disbursed,'" and noted that the objective of the Trust Fund Statute is to see that subcontractors are paid. Accordingly, the court in *Novick* construed the reach of the statute to include funds originating from the sale proceeds of a home that was built as part of a residential development project, because subcontractors had added value to the home. *Id.* at 219 (declining to limit the language "all funds disbursed" to comport with the narrow definition of the term "disburser" in a separate statutory section. *See* § 38–22–126(1), C.R.S.2009.). We agree that the statutory language requires the broad interpretation applied in *Novick*, and conclude the statutory language encompasses all funds disbursed on a construction project. Consequently, we conclude the trial court construed the statute too narrowly by determining that Yale's loans were a source of funding that fell outside the reach of the statute.

We are mindful of the dissent's concern that the General Assembly never intended the Trust Fund Statute to reach a manager's voluntary monetary contribution to his own construction company. The statutory language, however, does not limit the source of "funds disbursed" to construction loans. Nor can we. "[W]e must refrain from going beyond the plain meaning of the statute to 'accomplish something the plain language does not suggest.'" *Smith*, 230 P.3d at 1190 (quoting *Scoggins v. Unigard Ins. Co.*, 869 P.2d 202, 205 (Colo.1994)); *see Scoggins*, 869 P.2d at 205 ("[E]ven if the intent of the General Assembly can be disputed, if the plain language of the statute is clear, it is controlling."). We further recognize that any modification to ameliorate the statute's effect lies within the province of the legislature. *See McIntyre v. Bd. of County Comm'rs*, 86 P.3d 402, 419 (Colo.2004). "Where a statute leads to undesirable results, it is up to the General Assembly, not the courts, to determine the remedy." *Smith*, 230 P.3d at 1191.

### 2. The Purpose Behind Disbursements on a Project

AC Excavating also contends the trial court erred in relying on Yale's stated purpose for the use of his loans in determining that Yale was not liable under the Trust Fund Statute. Again, we agree.

Yale testified that although he did not specify any purpose under his loan agreement with Antelope, the funds he personally lent to Antelope were *intended* for general business purposes, including marketing, payment of employee wages, and payment of subcontractors on the construction project. The trial court characterized Yale's loans as "survival loans, which [Yale] used as manager for exactly the purpose *intended.*" (Emphasis added.) However, the court's reliance on Yale's intent was misplaced.

For a subcontractor to avail itself of section 38–22–127, it need not show that the disburser of the funds specifically intended that a trust be created; nor need it show that the disburser intended the disbursements to be allocated for the payment of subcontractors. *Novick*, 923 P.2d at 220 (citing 1 A. Scott, *Trusts* § 17.5 (3d ed. 1967) (as a general rule, statutory trusts do not require demonstration of settlor's intent to create a trust)). In *Novick*, the court rejected the premise that a trust is created under the statute based on the specific intent of the disburser of funds, because that would be inconsistent with the broad remedial purpose underlying the statute, which is to protect laborers and providers of construction materials. *Id.*

The Tenth Circuit Court of Appeals likewise has rejected an interpretation of Colorado's Trust Fund Statute to require that the disburser of funds specifically intend that subcontractors be paid with the funds. *See In re Siegfried*, 5 Fed.Appx. 856, 861 (10th Cir.2001) (unpublished order and judgment). The court in *Siegfried* warned that "such a reading would allow a borrower and lender to enter into a private agreement between themselves permitting the borrower to use the borrowed money for purposes other than the payment of subcontractors." *Id.* The court determined that this interpretation

would defeat the legislative purpose of section 38–22–127 to impose a trust to protect subcontractors who perform work on a construction project. *Id.* at 860. In accordance with the statute's purpose, the court in *Siegfried* interpreted the phrase "for which such disbursement was made" to refer to the *project* for which disbursements are made, and not the subcontractor. *Id.*

We agree with *Novick* and *Siegfried,* and conclude that in order to give effect to the legislative purpose, *see Smith,* 230 P.3d at 1189, a subcontractor may avail itself of the statute irrespective of the disburser's intended use for the funds. Accordingly, the trial court erred in relying on Yale's stated intent for the use of the money in concluding that his loans were not subject to a trust under the statute.

### 3. The Construction Project

Yale asserts, however, that the Trust Fund Statute does not apply to his loans to Antelope because they were not made specifically for the "construction project," but to Antelope itself. Given the evidence in the record, we are not persuaded.

According to Yale's testimony, the residential golf course community was Antelope's only project and Antelope had a single bank account containing funds used for its business operations and the development and construction of the project. The record does not include any evidence that Antelope was formed for any reason other than the development of the project. Similarly, the record does not include any evidence that Antelope's business operations consisted of anything other than facilitating the project. The money that Yale deposited into Antelope's account was used to pay bills that arose only as a result of the project.

For the reasons stated above, the trial court's judgment in favor of Yale on the Trust Fund Statute claim is reversed, and the case is remanded to the trial court for further proceedings on that claim.

### IV. Civil Theft Statute

■ AC Excavating contends that at the bench trial, the court erroneously determined that Yale was not liable for civil theft when he withdrew the last $50,000 from the Antelope account rather than pay the subcontractors. Specifically, AC Excavating argues that the court erroneously applied only subsection (1)(a) of the civil theft statute, section 18–4–401, in concluding that Yale was not liable because he did not intend to intentionally deprive AC Excavating of the money. It asserts the court was also required to apply subsection (1)(b) of the civil theft statute, and consider whether Yale knowingly used the money in such a manner as to deprive AC Excavating permanently of its use or benefit. We agree with AC Excavating that the court erred.

Section 38–22–127(5), C.R.S.2009, of the Trust Fund Statute provides that "[a]ny person who violates the provisions of subsections (1) and (2) of this section commits theft, as defined in section 18–4–401, C.R.S." Each of the essential elements of theft as set forth in section 18–4–401 must be proven, even where theft is alleged through violation of section 38–22–127. *People v. Erickson,* 695 P.2d 804, 805 (Colo.App.1984) (citing *People v. Brand,* 43 Colo.App. 347, 608 P.2d 817 (1979)).

Section 18–4–401 provides, in pertinent part:

(1) A person commits theft when he knowingly obtains or exercises control over anything of value of another without authorization, or by threat or deception, and:

(a) Intends to deprive the other person permanently of the use or benefit of the thing of value; or

(b) Knowingly uses, conceals, or abandons the thing of value in such manner as to deprive the other person permanently of its use or benefit. . . .

In the context of theft of construction project trust funds, the fact-finder must consider both the "intends to deprive" element of subsection 18–4–401(1)(a), and the "knowingly uses" element in subsection 18–4–401(1)(b) in determining liability for civil theft. *See People v. Anderson,* 773 P.2d 542, 545 (Colo. 1989). The failure to consider the evidence under the "knowingly uses" element in subsection 18–4–401(1)(b) constitutes reversible error. *Id.*

Here, the trial court applied only subsection (1)(a) of the civil theft statute. Accordingly, the trial court reversibly erred. The

trial court's entry of judgment in Yale's favor on the civil theft claim is therefore reversed, and the case is remanded to the trial court for further proceedings on that claim.

The judgment is reversed and the case is remanded for further proceedings.

Judge BERNARD concurs.

Judge CONNELLY dissents.

Judge CONNELLY dissenting.

Can a contractor who voluntarily funds his own construction company be held civilly or even criminally liable for not holding those funds "in trust" for subcontractors? I would answer no.

Colorado's Trust Fund Statute, § 38–22–127, C.R.S.2009, is meant "to protect" against "unscrupulous contractors." *In re Regan*, 151 P.3d 1281, 1286–87 (Colo.2007). It requires contractors to hold certain funds "in trust for the payment of" their subcontractors, laborers, or suppliers. A contractor who violates this statute by using trust funds for another purpose may be guilty of criminal theft. *See* § 38–22–127 (referencing § 18–4–401, C.R.S.2009).

The statute covers "[a]ll funds disbursed ... [1] under any building, construction, or remodeling contract" or "[2] on any construction project." § 38–22–127(1). No one contends here that the manager's injecting capital into his own company disbursed funds under a contract covered by the first bracketed provision. Rather, the subcontractor plaintiff contends that this self-funding triggered the second provision because the manager "disbursed" funds "on a[ ] construction project." In my view, this contention distends the statute's language and disserves its purposes.

By funding his own company, the manager did not "disburse[ ]" funds "on a[ ] construction project." A "disbursement" is the "act of *paying out* money, commonly from a fund or in settlement of a debt or account payable." Bryan A. Garner, *Black's Law Dictionary* 495 (8th ed. 2004) (emphasis added). In the context of construction projects, it most naturally is construed as funds paid out by an external source for past or future work or costs. Every Colorado case heretofore decided under the Trust Fund Statute has

involved that type of disbursement. *E.g., Regan*, 151 P.3d at 1283 (roofing company converted funds paid by developers); *Syfrett v. Pullen*, 209 P.3d 1167, 1169 (Colo.App. 2008) (contractor converted funds paid by homeowner for remodeling); *Flooring Design Assocs., Inc. v. Novick*, 923 P.2d 216, 220 (Colo.App.1995) (builder converted funds paid by owners to purchase home); *Alexander Co. v. Packard*, 754 P.2d 780, 781–82 (Colo.App.1988) (contractor converted funds paid by another company for sewer and water line construction).

I would hold that the manager's voluntary injection of his own money into his company did not disburse funds on a construction project. Accordingly, the company was free to use that new capital without treating it as trust funds.

That the statute was never intended to reach self-funded capital is also suggested by section 38–22–127(1)'s final clause, enumerating the intended beneficiaries as persons or entities "for which such disbursement was made." Where a third party disburses funds to a contractor for construction work or costs, subcontractors are among the trust beneficiaries of those disbursed funds. This is so, regardless of what the disburser or contractor may have intended, because trust fund beneficiaries are created by law rather than by private agreement. *See, e.g., Novick*, 923 P.2d at 220. But a contractor's injection of its own capital into a company is not necessarily a disbursement made for the benefit of subcontractors.

I therefore respectfully disagree with the majority's holding that the manager's own capital injection created trust funds that could be used for no purpose other than paying subcontractors. Contrary to the majority, I do not believe the General Assembly ever intended for a project manager to be liable for civil conversion—and possibly even guilty of criminal theft—for expenditures of monies that he himself contributed voluntarily to his construction company.

Ultimately, any doubt as to the statute's reach should be resolved in a way that "best effectuates" its "purposes." *Smith v. Executive Custom Homes, Inc.*, 230 P.3d 1186, 1189 (Colo.2010). Viewed narrowly, any result favoring an unpaid subcontractor could be

deemed to further a statute designed to benefit subcontractors. But this particular subcontractor's victory will come at the expense of future homeowners, subcontractors, and laborers.

Here, had the manager not voluntarily injected his own capital into the company, the "trust funds" disbursed to the company by third parties would have been depleted. There is no dispute that the manager's funding provided the subcontractor and others with payments they otherwise would not have received. This accordingly is not a case in which a beneficiary was cheated out of trust funds by an "unscrupulous contractor," *Regan*, 151 P.3d at 1287.

A lawyer familiar with today's holding likely would advise the manager not to recapitalize the company if there was any doubt as to the project's ultimate success. That would hurt, not help, the homeowners, subcontractors, and other intended beneficiaries of the Trust Fund Statute. Accordingly, I dissent.