2013 CO 10

**Donald A. YALE, Petitioner**

v.

**AC EXCAVATING, INC., a Colorado Corporation, Respondent**

**Supreme Court Case No. 10SC709**

Supreme Court of Colorado.

February 4, 2013

Attorneys for Petitioner: Ireland Stapleton Pryor & Pascoe, PC, Timothy G. Atkinson, Kelley B. Duke, Denver, Colorado.

Attorneys for Respondent: Craig D. Johnson & Associates, P.C., Henry A. Sand, Craig D. Johnson, Broomfield, Colorado.

Attorneys for Amicus Curiae Colorado Association of Home Builders: Holley, Albertson & Polk, P.C., Dennis B. Polk, Melissa R. Liff, Golden, Colorado.

JUSTICE MÁRQUEZ delivered the Opinion of the Court.

¶ 1 In this case, we address whether funds received by a limited liability company from one of its members to capitalize the company must be held in trust for the payment of subcontractors, laborers, and material suppliers under Colorado's construction trust fund statute, section 38–22–127, C.R.S. (2012). We conclude that the LLC member's voluntary injection of capital into the company in this case did not constitute "funds disbursed to [a] contractor ... on [a] construction project" under section 38–22–127(1), C.R.S. (2012), and, therefore, such money was not required to be held in trust under that provision. Because such funds were not required to be held in trust, the court of appeals erred in remanding the case for further proceedings to determine whether the petitioner, a member and manager of the LLC, is civilly liable for theft under sections 38–22–127(5), 18–4–401, and 18–4–405, C.R.S. (2012), for using the funds to pay other corporate obligations rather than paying the respondent subcontractor in full for the work it did for the LLC. We therefore reverse the judgment of the court of appeals.

I.

¶ 2 Antelope Development, LLC (the "LLC") was formed in the late 1990s for the purpose of developing and operating the Antelope Hills subdivision, a residential golf course community near Bennett, Colorado. To finance the construction of the residential development and golf course, the LLC received construction loans from First National Bank and, later, Horizon Bank. By 2005,

however, the LLC had exhausted its construction financing and was in financial dire straits.

¶3 In 2006, the LLC entered into oral agreements with Respondent AC Excavating, Inc., for excavation work on a golf course retention pond and for remedial grading work on several Antelope Hills residential lots owned by the Coxsey family. AC Excavating completed work on both the pond and Coxsey projects. The LLC paid AC Excavating $150,000 of the $190,680.30 invoiced for the pond project, and nothing on the $7,707.50 invoiced for the Coxsey Project. AC Excavating's unpaid invoices totaled $48,387.80.

¶4 Petitioner Donald A. Yale, a member of the LLC, became the sole manager of the LLC on June 30, 2006. At that time, the LLC's single bank account contained about $100,000. Realizing that the LLC had insufficient funds to meet its obligations, Yale voluntarily deposited a total of $157,500[1] of his own money into the LLC's account in several installments. He testified at trial that these personal funds were "survival loans" made in an attempt to keep the LLC in business. In his discretion as manager, Yale then applied these funds to the LLC's general business expenses and some of the outstanding subcontractor invoices. Although Yale used some of these "survival loan" proceeds to pay AC Excavating (as well as other subcontractors), AC Excavating was not paid in full.

¶5 Yale gave up on the LLC in late 2006. Thereafter, AC Excavating sued Yale,[2] alleging, among other things, that the LLC violated Colorado's construction trust fund statute, section 38–22–127(1), by failing to hold the funds in the LLC's bank account in trust for payment to AC Excavating and instead using those funds for other purposes. AC Excavating further alleged that Yale thereby had committed theft, permitting it to claim treble damages, attorney fees, and costs against Yale under the Rights in Stolen Property statute, section 18–4–405.

¶6 Following a one-day bench trial, the trial court issued a detailed written order and entered judgment for Yale. Relevant here, the trial court noted that AC Excavating asserted for the first time at trial that the $157,500 in personal funds that Yale voluntarily deposited into the LLC's account constituted the corpus of a trust subject to the obligations of section 38–22–127(1).[3] The trial court held that, even assuming the argument was properly raised, the LLC was not required to hold the $157,500 in trust under section 38–22–127. Based on the evidence presented at trial, including Yale's undisputed testimony, the trial court concluded that these funds were not disbursed on a construction project but instead were a "survival loan" to capitalize a struggling company:

> Even assuming AC Excavating could properly advance this assertion [regarding Yale's $157,500 voluntary deposit] for the first time at trial, the Court refuses its invitation to extend C.R.S. § 38–22–127 to such funds. An investor or lender, who is under no current obligation to fund a developer, has the right to dictate the terms of the funds provided. If he is also serving as manager, how that new investment is used should be within his sole discretion. Any contrary result would provide an incentive to business managers to abstain from investing additional funds into struggling development companies in order to salvage them.

---

**1.** Although the record shows that Yale deposited other monies into the LLC's bank account, AC Excavating has not specifically argued that those other monies should have been held in trust under section 38–22–127(1). To the extent that AC Excavating's claim is based on those other funds, we decline to address it. (See People v. Diefenderfer, 784 P.2d 741, 752 (Colo.1989)) (declining to address an argument because "[i]t is the duty of counsel for appealing parties to inform a reviewing court both as to the specific errors relied upon and as to the grounds, supporting facts and authorities therefor").

**2.** AC Excavating originally brought suit against the LLC and other defendants, all of which either defaulted or were dismissed from the case.

**3.** Prior to trial, AC Excavating's trust fund claim was based on other monies in the LLC account, including the remaining proceeds of earlier construction loans, funds allocated in an escrow agreement, and funds under certain letters of credit. AC Excavating failed to prove its claim with respect to these monies, which are not at issue in this appeal.

The $157,500 funds Mr. Yale deposited into the [LLC] account ... were not part of a construction loan or a loan for a construction project. Rather, they were part of a survival loan to attempt to salvage a struggling company.

¶ 7 The trial court also rejected AC Excavating's theft claim, finding that "no evidence was presented that Mr. Yale intended to exercise control over anything of value, or intended to intentionally deprive AC Excavating of money." See § 18–4–401(1)(a), C.R.S. (2012) (providing that "[a] person commits theft when he knowingly obtains or exercises control over anything of value of another without authorization" and "[i]ntends to deprive the other person permanently of the use or benefit of the thing of value"). To the contrary, the trial court reasoned, the testimony and exhibits reflected that Yale "did just the opposite when he deposited the $157,500 into [the LLC's] general operating account in an effort to extend [the LLC's] life and provide some measure of reimbursement to creditors like AC Excavating in this case." The trial court concluded that Yale could not be held personally liable for the LLC's debt to AC Excavating.

¶ 8 The court of appeals reversed, holding that Yale's loans fell within the scope of the statute because section 38–22–127(1) "encompasses all funds disbursed on a construction project." *AC Excavating, Inc. v. Yale*, No. 09CA2184, 297 P.3d 937, 2010 WL 3432219, at *3 (Colo.App. Sept. 2, 2010). It concluded that the trial court erred in relying on Yale's stated intent for the use of the money. *Id.* at 940–41, at *4. Relying on *Flooring Design Associates, Inc. v. Novick*, 923 P.2d 216 (Colo.App.1995), the court of appeals observed that a subcontractor "need not show that the disburser of the funds specifically intended that a trust be created; nor need it show that the disburser intended the disbursements to be allocated for the payment of subcontractors." *AC Excavating*, 297 P.3d at 940, 2010 WL 3432219, at *4 (citing *Novick*, 923 P.2d at 220). Therefore, the court of appeals reasoned, the trust fund

statute applies "irrespective of the disburser's intended use for the funds." *Id.*

¶ 9 The court of appeals also rejected Yale's contention that the trust fund statute does not apply to his loans because the loans were made to the LLC itself, and not specifically for a "construction project." The court observed that the record contained no evidence that the LLC was formed or operated for any purpose other than developing the Antelope Hills subdivision, or that the LLC's business operations consisted of anything other than facilitating that project. It therefore concluded that the money Yale deposited into the LLC's single bank account was used "to pay bills that arose only as a result of the project." *Id.* at 941, at *5.

¶ 10 The court of appeals further held that the trial court reversibly erred when it applied only subsection (1)(a) of the theft statute and failed to consider, under subsection (1)(b), whether Yale "knowingly use[d]" the funds he deposited into the LLC's account in such a manner as to deprive AC Excavating permanently of their use or benefit. *Id.* at 941–42, at *5–6 (quoting § 18–4–401(1)(b), C.R.S. (2012)). It therefore remanded the case for further proceedings on the theft claim.

¶ 11 In dissent, Judge Connelly reasoned that the construction trust fund statute does not apply to the $157,500 Yale deposited into the LLC's account because Yale's "voluntary injection of his own money into his company did not disburse funds on a construction project." *Id.* at *6 (Connelly, J., dissenting). Judge Connelly relied on the dictionary definition of "disbursement" as the " 'act of *paying out*, commonly from a fund or in settlement of a debt or account payable,' " id. (quoting *Black's Law Dictionary* 495 (8th ed. 2004)), and reasoned that, in the context of construction projects, a disbursement is most naturally construed as funds paid out by an external source for past or future work or costs. *Id.*

¶ 12 We granted Yale's petition for writ of certiorari to review both the construction trust fund and civil theft issues.[4]

---

4. We granted certiorari review of the following two issues:

(1) Whether all funds made available to the developer of a construction project, including

## II.

¶ 13 We review the court of appeals' interpretation of a statute de novo. *Dworkin, Chambers & Williams, P.C. v. Provo*, 81 P.3d 1053, 1057 (Colo.2003). Our primary duty in construing statutes is to give effect to the intent of the general assembly. *Lombard v. Colo. Outdoor Educ. Ctr., Inc.*, 187 P.3d 565, 570 (Colo.2008). When interpreting a statute, we strive to adopt an interpretation that best effectuates the legislative purpose. *Smith v. Exec. Custom Homes, Inc.*, 230 P.3d 1186, 1189 (Colo.2010). In so doing, we first look to the plain language of the statute. *In re Regan*, 151 P.3d 1281, 1284 (Colo.2007). Where the statutory language is clear and unambiguous, we do not resort to other rules of statutory construction. *Smith*, 230 P.3d at 1189.

## III.

¶ 14 The general assembly enacted section 38–22–127 in 1975 as part of the general mechanics' lien statutes. It provides:

All funds disbursed to any contractor or subcontractor under any building, construction, or remodeling contract or on any construction project shall be held in trust for the payment of the subcontractors, laborer or material suppliers, or laborers who have furnished laborers, materials, services, or labor, who have a lien, or may have a lien, against the property, or who claim, or may claim, against a principal and surety under the provisions of this article and for which such disbursement was made.

§ 38–22–127(1). Although this provision provides assurances of payment to subcontractors, laborers, and suppliers, the general assembly's "primary concern" in enacting it was "the protection of *property owners* against unscrupulous contractors." *In re Regan*, 151 P.3d at 1286. The trust obligation protects owners from having to pay for labor or materials twice in an effort to avoid mechanics' liens if a dishonest con-

tractor collects an initial payment from the owner but fails to pay a subcontractor, laborer, or supplier, thereby leaving the owner with little choice other than to make a second payment directly to the unpaid potential lienholder. Section 38–22–127(1) effectuates this purpose by requiring contractors and subcontractors to hold certain funds in trust for the payment of subcontractors, laborers, and suppliers—namely, all funds "disbursed to any contractor or subcontractor under any building, construction, or remodeling contract or on any construction project."

¶ 15 In a typical scenario under this provision, the funds disbursed to the contractor or subcontractor come from a third party, usually in the form of a construction loan or a payment under a construction contract for construction work or costs. In this case, however, the funds disbursed to the contractor (the LLC) came from an owner of the business (Yale) who was under no obligation to provide such funds to the company. The funds were then applied to the contractor's general business expenses and some of its outstanding subcontractor invoices. The question is whether, under these circumstances, the funds received from Yale were required to be held in trust.

¶ 16 We reverse the court of appeals and hold that the $157,500 in personal funds that Yale deposited into the LLC's account were not trust funds under section 38–22–127(1) because, under the circumstances of this case, Yale's voluntary injection of his own money as a "survival loan" to the LLC did not constitute "funds disbursed to any contractor ... on [a] construction project" under that provision. The trial court did not err when it considered Yale's testimony regarding the purpose of his voluntary loans to the LLC as relevant evidence in determining whether these funds were disbursed "on [a] construction project." In addition, section 38–22–127(1) does not require a business entity to hold in trust all funds it receives merely because it is engaged in a single

an owner's voluntary loans or capital contributions, are subject to the Colorado Trust Fund Statute, section 38–22–127, C.R.S. (2010), thereby requiring those invested funds to be held in trust for subcontractors.

(2)  Whether the court of appeals erred when it remanded the issue of whether petitioner was liable for civil theft under section 18–4–401, C.R.S. (2010).

development project and has a single bank account.

## A.

■ ¶ 17 This case requires us to construe section 38–22–127(1). By its plain language, the trust obligations of section 38–22–127(1) are triggered only where funds are (1) "disbursed" (2) "to a contractor or subcontractor" (3) "under [a] building, construction, or remodeling contract or on [a] construction project."

¶ 18 In this case, the first two conditions are met. First, "disbursed" is the past tense of the verb "to disburse," which means to pay out or distribute money. *See Webster's Third New International Dictionary* 644 (2002). A "disbursement" can be a payment in settlement of a debt or account payable, *see Black's Law Dictionary* 530 (9th ed. 2009), and in the context of section 38–22–127(1), the phrase "funds disbursed" most frequently describes a payment from a third party to a contractor for construction work or costs. Colorado cases interpreting this statute generally follow such a fact pattern. *See, e.g.,   In re Regan*, 151 P.3d at 1283 (builders or owners of particular property paid roofing contractor for roof installation and repair work done on that property); *People v. Anderson*, 773 P.2d 542, 543–44 (Colo.1989) (homeowner disbursed funds to contractor for payment of any outstanding liens or debts for work performed under contract to build custom home); *Syfrett v. Pullen*, 209 P.3d 1167, 1169 (Colo.App.2008) (homeowner paid contractor under construction contract to remodel home); *Alexander Co. v. Packard*, 754 P.2d 780, 781 (Colo.App. 1988) (company made payments to contractor under an agreement to perform sewer and water line construction work on one of company's projects). However, money can also be "disbursed" to a contractor under a loan

arrangement. *See   Crissey Fowler Lumber Co. v. First Cmty. Indus. Bank*, 8 P.3d 531, 534 (Colo.App.2000) (noting that, in general, a construction loan agreement creates a loan account from which funds are disbursed as the construction progresses). Although loan proceeds to a contractor often originate from an external third party (such as a bank), they may also come from an owner of the business. In the LLC context, for example, a member or manager of the LLC may lend money to the LLC. § 7–80–404(5), C.R.S. (2012). In this case, the $157,500 that Yale deposited into the LLC's account constituted funds "disbursed" to the LLC, under the plain and ordinary meaning of the term "disbursed."

¶ 19 Second, for purposes of this opinion, we assume that the LLC stood in the position of a "contractor" in relation to AC Excavating. Although the record is somewhat unclear on this point, Yale does not contend otherwise.

■ ¶ 20 Thus, the issue here is the third condition: whether the funds Yale deposited into the LLC's account were disbursed "on [a] construction project."[5] Certainly, payments received for work performed on a construction project fall within the scope of section 38–22–127(1). Proceeds from construction loans to finance a construction project likewise fall within the scope of the provision.[6] On the other hand, a loan or voluntary contribution given to *capitalize a business*[7] is disbursed to the business itself and may be used to pay for any of the company's obligations, including general operating expenses (e.g., taxes, utilities, rent, etc.). Such loans or capital contributions are not "funds disbursed" "under [a] building, construction, or remodeling contract or on [a] construction project" that must be held in trust un-

---

**5.** AC Excavating does not argue that the funds at issue here were disbursed "under [a] building, construction, or remodeling contract." § 38–22–127(1).

**6.** Although construction projects are often financed through construction loans, we note that such projects can be financed in myriad other ways, including through land loans, non-mort-

gage borrowing, equity financing, and disbursement of insurance proceeds. *See generally* Alvin L. Arnold & Marshall Tracht, *Construction and Development Financing* (3d ed. 2001).

**7.** An LLC, for example, can be capitalized through a capital contribution from a member, § 7–80–501, C.R.S. (2012), a loan from a member or manager, § 7–80–404(5), or both.

der section 38–22–127(1) for the benefit of subcontractors.

¶ 21 To determine whether particular funds were disbursed to a contractor "on [a] construction project," a court should consider the totality of the circumstances, bearing in mind the statute's purpose of protecting homeowners, subcontractors, laborers, and suppliers against unscrupulous contractors. Relevant considerations include who disbursed the funds; the relationship between the disburser and the contractor or subcontractor receiving the funds; and the circumstances of the disbursement, including whether the funds were earmarked for construction, whether conditions were placed on the disbursement indicating the funds were to be dedicated to a construction project, and any other evidence of the disburser's intent to disburse funds on a construction project.

¶ 22 In this case, the trial court found, based in part on Yale's undisputed testimony, that Yale's purpose in depositing $157,500 in personal funds into the LLC's account was to try to "salvage the critical bills" and that, therefore, these funds were not "construction loans," but survival loans, which Yale, as the manager of the LLC, used for exactly the purpose intended. Based on the evidence presented, the trial court concluded that these funds were not disbursed to the LLC as a construction loan or on a construction project. It therefore entered judgment for Yale on AC Excavating's claim under section 38–22–127.

¶ 23 The record supports the trial court's conclusion. The record establishes that Yale's general practice over the years in lending money to the LLC was to finance general operations, not specific construction work. The trial court found that the LLC used a portion of the total proceeds of Yale's loans between 1998 and 2006 to finance construction of residential development infrastructure, but that it also used these proceeds to finance "general operations," including the costs associated with golf course operations, employee wages and salaries, permits, legal fees, marketing, and taxes. The trial court found that, unlike the LLC's bank loans, which "were specific to construction activities, schedules, budgets,

and expenditures," Yale intended and expected the LLC to use his loans to fund general operations and obligations necessary to keep the LLC in business. The record reflects that at the time Yale voluntarily deposited $157,500 of his personal funds into the LLC's bank account, construction loan financing from First National Bank and Horizon Bank had been exhausted and the LLC was inadequately capitalized. Nothing in the record suggests that Yale owed the LLC money for construction work the LLC did for him personally, or that he was otherwise obligated in any way to fund the LLC. Nor does the record suggest that at the time Yale made these deposits, he placed any conditions on the disbursements or that the funds deposited were earmarked for specific construction work.

¶ 24 In sum, the record in this case supports the trial court's finding that Yale, as a member and manager of the LLC, voluntarily deposited personal funds into the LLC's account solely to shore up its capitalization in a last-ditch effort to salvage the struggling company. Accordingly, the trial court properly concluded that the LLC did not have to hold the $157,500 in trust pursuant to section 38–22–127(1). Yale, as the manager of the LLC, was free to apply those funds for the corporation's benefit in any manner consistent with his fiduciary obligations to the corporation, including paying the LLC's "critical bills" in an (ultimately futile) attempt to ensure that the LLC could continue to operate as a going concern and generate revenues to pay off its obligations. Finally, we note that Yale's voluntary injection of his own money to the LLC provided AC Excavating and other subcontractors with payments they otherwise would not have received. Although this fact is not dispositive, we agree with Judge Connelly that this is "not a case in which a beneficiary was cheated out of trust funds by an 'unscrupulous contractor.'" *AC Excavating*, —— P.3d at ——, 2010 WL 3432219, at *7 (Connelly, J., dissenting) (quoting *In re Regan*, 151 P.3d at 1287).

### B.

¶ 25 The court of appeals concluded that "the trial court erred in relying on

Yale's stated intent for the use of the money in concluding that his loans were not subject to a trust under the statute." *AC Excavating*, 297 P.3d at 941, 2010 WL 3432219, at *4. It further rejected Yale's contention that his loans to the LLC were not made to fund the construction project, given that the LLC was engaged in a single development project and had a single bank account. We disagree with both conclusions.

¶ 26 In reaching its first conclusion, the court of appeals relied on *Flooring Design Associates, Inc. v. Novick*, 923 P.2d 216 (Colo.App.1995). In that case, a pair of "merchant home builder" corporations constructed homes on land owned by the corporations, using subcontractors in the construction process. Upon completion of construction, the corporations received the balance of the purchase price from the home buyer at the closing. The corporations then paid remaining debts to the subcontractors. *Id.* at 217. A subcontractor successfully sued the corporations and an officer (Edward Novick), alleging that the corporations failed to hold in trust the funds received at the closings. *Id.* at 217–18. On appeal, Novick argued, among other things, that the corporations had no trust obligation under section 38–22–127 because the homeowners (as disbursers of the funds at issue) did not specifically intend that the funds be held in trust for the subcontractor. *Id.* at 220. Novick expressly relied on the final clause of section 13–22–127(1), "for which such disbursement was made," to argue that a statutory trust is created only when the disburser specifically intends to create a trust. *Id.*

¶ 27 The court of appeals rejected Novick's interpretation of the statute, citing the general rule that statutory trusts do not require demonstration of a settlor's intent to create a trust. *Id.* (citing 1 A. Scott, *Trusts* § 17.5 (3d ed. 1967)). Accordingly, the *Novick* court held that a subcontractor seeking to avail itself of section 38–22–127 need not show that the disbursers specifically intended to create a trust or that the disburser intended the disbursements to be allocated for the payment of subcontractors. *Id.*

¶ 28 The holding in *Novick* does not compel the conclusion reached by the court of appeals in this case. First, the homeowners in *Novick* (1) disbursed funds at closing (2) to the merchant homebuilder contractors (3) pursuant to an option contract. *Id.* at 217. Thus, whether the funds had been disbursed under a construction contract or on a construction project was never an issue in that case. Second, the *Novick* court merely recognized that the act of disbursing funds to a contractor or subcontractor under a construction contract or on a construction project creates a trust—even where the disburser does not specifically intend that the funds be held in trust for payment of the subcontractors. In that sense, *Novick* stands for the general proposition that a statutory trust arises as a matter of law once the statutory requirements are met, and does not require any additional showing that the settlor intended to create a trust. By contrast, the question here is whether the statutory requirements have been met, namely, whether the funds at issue were disbursed "on any construction project" for purposes of section 38–22–127. Third, the general rule cited in *Novick* that statutory trusts do not require demonstration of the settlor's *intent to create a trust* does not preclude a court from considering a disburser's intent entirely. Along with other circumstances of the disbursement, evidence of the purpose of the disbursement—including the disburser's stated intent—is relevant to determining whether the funds were disbursed "on [a] construction project" for purposes of section 38–22–127(1). The trial court therefore did not err by considering such evidence.

¶ 29 The court of appeals also rejected Yale's contention that section 38–22–127(1) does not apply to his loans because they were made to the LLC itself, and not specifically for the "construction project." *See AC Excavating*, 297 P.3d at 940–41, 2010 WL 3432219, at *4-5. The court reasoned that, because the LLC's operations were limited to one development project, the money Yale deposited into the LLC's single bank account was used "to pay bills that arose only as a result of the project." *Id.* at 941, at *5.

¶ 30 By its language, section 38–22–127(1) imposes a statutory trust only where funds are disbursed to a contractor or subcontractor and where such funds are disbursed "under [a] ... construction ... contract or on [a] construction project." Thus, the provision acknowledges a distinction between the contractor and the project. The court of appeals erred in treating any and all funds deposited into the LLC's single bank account—regardless of the purpose—as funds disbursed "on [a] construction project," simply because the LLC's operations pertained to one development project. The fact that a contractor is working on a single project or has only a single bank account[8] does not automatically transform all funds received by the contractor into funds required to be held in trust under section 38–22–127(1). In reasoning otherwise, the court of appeals effectively conflated the contractor (as a business entity) with the construction project itself.

¶ 31 Under the court of appeals' view, literally all funds received by such a contractor (whether a business owner's injection of his or her own capital, proceeds from general bank loans for operating expenses, or interest earned on savings accounts) would have to be held in trust, such that the company could not pay its general operating expenses without violating section 38–22–127(1) and subjecting its decision-makers to liability for theft under sections 18–4–401 and 18–4–405. See § 38–22–127(5). Such an approach is untenable. Indeed, to construe section 38–22–127(1) to encompass all funds deposited into a contractor's bank account where the business happens to be an entity engaged in a single development project could discourage managers from investing in a struggling company because the trust obligations of section 38–22–127(1) not only would impair the manager's ability to direct those funds to pressing general business expenses if any bills to subcontractors, laborers, or suppliers remain outstanding, but would also subject the manager to civil or even criminal liability

if the manager used those funds for anything other than payment to those subcontractors, laborers, or suppliers. As Judge Connelly observed, under the court of appeals' holding, a lawyer "likely would advise the manager not to recapitalize the company if there was any doubt as to the project's ultimate success. That would hurt, not help, the homeowners, subcontractors, and other intended beneficiaries of the Trust Fund Statute." *AC Excavating,* 297 P.3d at 943, 2010 WL 3432219, at *7 (Connelly, J., dissenting).

## IV.

¶ 32 We now turn to the theft claim. Subsection 38–22–127(5) provides that a "person who violates the provisions of" section 38–22–127(1) "commits theft, as defined in section 18–4–401, C.R.S." Under section 18–4–405, an owner of property taken by theft may recover treble damages, costs, and reasonable attorney fees from the taker. In this case, AC Excavating based its theft allegation against Yale solely on the LLC's alleged violation of section 38–22–127(1). It did not plead a separate claim for theft under section 18–4–401. We have determined that the $157,500 in personal funds that Yale deposited into the LLC's account did not have to be held in trust under section 38–22–127(1). Therefore, as a matter of law, Yale (as manager of the LLC) cannot be held civilly liable for theft, as defined in section 38–22–127(5), for using those funds to pay other corporate obligations instead of paying in full the amounts owed to AC Excavating. Accordingly, we reverse the court of appeals' decision to remand the case for further proceedings on the theft issue.

## V.

¶ 33 Section 38–22–127(1) does not apply to the $157,500 in personal funds that Yale deposited into the LLC's account because such monies did not constitute "funds disbursed to any contractor ... on [a] construction pro-

---

**8.** Nothing is improper about a contractor or subcontractor having a single bank account. *See* § 38–22–127(4), C.R.S. (2012) ("Every contractor or subcontractor shall maintain separate records of account for each project or contract, but nothing contained in this section shall be construed as requiring a contractor or subcontractor to deposit trust funds from a single project in a separate bank account solely for that project so long as trust funds are not expended in a manner prohibited by this section.").

ject" under that provision. As a result, Yale cannot be civilly liable for theft under sections 38–22–127(5) and 18–4–405. We therefore reverse the judgment of the court of appeals.