The BOARD OF COUNTY COMMISSION-ERS OF the COUNTY OF RIO BLAN-CO, Colorado, Plaintiff–Appellant,

v.

EXXONMOBIL OIL CORPORATION, Defendant–Appellee.

No. 07CA1054.

Colorado Court of Appeals, Div. V.

July 24, 2008.

Murray Dahl Kuechenmeister & Renaud, LLP, Malcolm M. Murray, M. Patrick Wilson, Denver, CO, for Plaintiff–Appellant.

Silverstein & Pomerantz, LLP, Neil I. Pomerantz, Robert R. Gunning, Denver, CO, for Defendant–Appellee.

Opinion by Judge GRAHAM.

Plaintiff, the Board of County Commissioners of Rio Blanco County, appeals the trial court's judgment affirming the determination of the Executive Director of the Colorado Department of Revenue that certain equipment used by defendant, ExxonMobil Oil Corporation, in connection with its natural gas operations in Rio Blanco County, did not constitute "construction and building materials" and therefore could not be assessed under the county and municipal use tax statute, section 29-2-109(1), C.R.S.2007. We affirm.

ExxonMobil extracts and processes natural gas in Rio Blanco County. To facilitate its operations during the relevant time period here (January 1, 2003 through July 31, 2004), ExxonMobil brought various equipment and materials into Rio Blanco County.

We find it helpful to explain briefly ExxonMobil's natural gas operations, drawing upon facts which are either largely undisputed or were stipulated by the parties. ExxonMobil begins its natural gas extraction and processing operations by drilling a well bore into the earth at a series of well sites to reach natural gas deposits. It inserts varying "strings" of pipe, or casing, into the well bore to prevent its collapse during the extraction process.

Some, but not all, of the casing is cemented into place. Natural gas and other accompanying fluids, such as condensate and water, are brought to the surface through linked sections of tubing, known as tubulars, that hang inside the well bore. Surface equipment at the well site, such as casing heads, "Christmas trees" (an assembly of valves, spools, and fittings), and manifolds, regulates and directs the flow of the extracted elements. The elements are initially processed by gas processing units that separate natural gas from oil condensate and water. Tanks at certain of the well sites provide temporary storage for the extracted fluids. A system of pipes, or flowlines, directs the natural gas and any remaining liquids from the well sites to gathering lines, which then direct the elements to one of two of ExxonMobil's gas processing plants in Rio Blanco County.

At the gas processing plants, various equipment, including compressors, amine units, hydrocarbon dewpoint control units, a furl gas system, a separator, and a "slug catcher" (a manifold that separates lighter gas from heavier liquids), further processes the natural gas. Additional storage tanks at the processing plants collect extracted liquids pending off-site sale or disposal. An instrument and electrical unit (I & E unit) at the processing plant provides an enclosure for computers and company employees that monitor and manage the processing plant.

ExxonMobil also operates saltwater disposal sites where saltwater that has been separated from the natural gas is collected. Equipment at the saltwater disposal sites pumps the saltwater to an injection well, where the saltwater is pumped back into the earth.

Each component of the natural gas system is interconnected, interdependent on, and interrelated to, the other system components. Therefore, if one component is removed or malfunctions, the entire system shuts down or ceases to operate properly.

The various system components are not readily interchangeable or completely fungible; rather, they were selected, designed, and engineered for each specific location and installation. In addition, the individual components at each location, such as tanks, gas processing units, and wellhead configurations, have specific sizing, ratings, and capacities that meet the criteria of the specific well, including pressure and impurity content. Most of the component parts are attached or connected to the system on site in Rio Blanco County.

The component structures, such as gas processing units, tanks, and other facilities, are durable, have been in place for many years, and in some cases, have been in their present location since the completion of the well. However, certain other equipment, such as gathering lines and flow lines, often has to be repaired or replaced. If equipment needs to be replaced, ExxonMobil will replace it with equipment from its other operations out of state or within Rio Blanco County. Almost all the equipment and materials used in ExxonMobil's natural gas operations are readily moveable. For example, tubulars and some of the casing may be removed from the well bore and reused elsewhere. Surface equipment used by ExxonMobil at the well sites, processing plants, and saltwater disposal sites is designed in a manner that facilitates its movement for the purpose of repair, replacement, or relocation. Certain equipment is designed with roll bars to permit movement on and off the transport trucks. When placed into service, some equipment is bolted to a concrete pad, generally to reduce vibration, while other equipment, such as many of the storage tanks, simply rests on the bare earth. ExxonMobil leased much of the equipment used at one of its processing plants in Rio Blanco County from a third party before purchasing the used equipment.

ExxonMobil tracks the location of all subsurface piping and assigns serial numbers and bar codes to most equipment. ExxonMobil's assets ledgers identify each item of equipment individually, and the equipment at issue here is designated "fixed assets."

Almost all ExxonMobil's well sites in Rio Blanco County are located on land that is leased from the Bureau of Land Management. ExxonMobil has never obtained, and the county does not require, building permits for any of its well bores, pipelines, or equipment. Finally, when a well site is

abandoned, ExxonMobil is responsible for remediation and reclamation of the site, which include removal of well pads, grass reseeding, grading, and recontouring the land to its original condition.

The County issued ExxonMobil a notice of deficiency which assessed additional use taxes, plus interest and penalties, in the amount of $748,400, for the period at issue. The assessment provided that various items of equipment and materials used by ExxonMobil in its natural gas operations in Rio Blanco County constituted taxable "construction and building materials" pursuant to section 29–2–109(1). ExxonMobil appealed the assessment to the County Petition Board, which upheld the assessment.

On appeal from the Petition Board, the Department of Revenue found that the equipment in dispute did not constitute "construction and building materials" under section 29–2–109(1).

The County appealed to the trial court pursuant to sections 29–2–106.1(7) and 39–21–105, C.R.S.2007. ExxonMobil agreed to pay the use tax on a compressor enclosure at one of its processing plants, and, therefore, that piece of equipment was not at issue before the trial court. After a bench trial, the court upheld the Department's ruling that the equipment in dispute did not constitute "construction and building materials." Specifically, the court determined that the term "construction and building materials" means only items that become improvements to real property and that the equipment in dispute was installed for the purpose of natural gas operations and did not add value or constitute an improvement to the real property apart from the business conducted thereon.

The County appeals from a judgment entered after a trial to the court.

## I. Standard of Review

An appeal to the district court pursuant to section 29–2–106.1(7) is a trial de novo. § 39–21–105(2)(b), C.R.S.2007. A decision of the district court is reviewable by this court "as is otherwise provided by law." § 39–21–105(7), C.R.S.2007; *accord Catholic Health*

*Initiatives Colo. v. City of Pueblo,* 183 P.3d 612, 615 (Colo.App.2007).

We, therefore, review the trial court's judgment as a mixed question of fact and law. We defer to the court's credibility determinations and will disturb its findings of fact only if they are clearly erroneous and not supported by the record. *M.D.C./Wood, Inc. v. Mortimer,* 866 P.2d 1380, 1383 (Colo. 1994); *Page v. Clark,* 197 Colo. 306, 313, 592 P.2d 792, 796 (1979). We review de novo the court's application of the governing legal standards. *Ocmulgee Props. Inc. v. Jeffery,* 53 P.3d 665, 667 (Colo.App.2001).

■ Statutory interpretation is a question of law that we review de novo. *Ryals v. St. Mary–Corwin Reg'l Med. Ctr.,* 10 P.3d 654, 659 (Colo.2000).

■ Our goal in such interpretation is to determine and give effect to the intent of the General Assembly. *Moffett v. Life Care Ctrs.,* 187 P.3d 1140, 1143 (Colo.App.2008) (citing *Colo. Office of Consumer Counsel v. Pub. Utils. Comm'n,* 42 P.3d 23, 27 (Colo. 2002)). We first consider the statutory language, giving the words in the statute their plain and ordinary meaning. *Golden Animal Hosp. v. Horton,* 897 P.2d 833, 836 (Colo. 1995). A statute should be interpreted as a whole, giving effect to all of its parts. *Zab, Inc. v. Berenergy Corp.,* 136 P.3d 252, 255 (Colo.2006). "[W]e look at the context in which a statutory term appears, and the meaning of a word may be ascertained by reference to the meaning of words associated with it." *Wolf Creek Ski Corp. v. Bd. of County Comm'rs,* 170 P.3d 821, 825 (Colo. App.2007) (quoting *Robinson v. Colo. State Lottery Div.,* 155 P.3d 409, 413 (Colo.App. 2006), aff'd in part and rev'd in part, 179 P.3d 998 (Colo.2008)); *see Premier Farm Credit, PCA v. W–Cattle, LLC,* 155 P.3d 504, 513 (Colo.App.2006).

■ If the language of a statute "is clear and the intent of the General Assembly may be discerned with certainty, we need not resort to other rules of statutory interpretation." *W. Fire Truck, Inc. v. Emergency One, Inc.,* 134 P.3d 570, 573 (Colo.App.2006). But if the language is ambiguous, we look to "legislative history, prior law, the conse-

quences of a given construction, and the goal of the statutory scheme to ascertain the correct meaning of a statute." *Bd. of County Comm'rs v. Costilla County Conservancy Dist.*, 88 P.3d 1188, 1193 (Colo.2004) (quoting *People v. Luther*, 58 P.3d 1013, 1015 (Colo. 2002)).

We also presume that the legislature intended a just and reasonable result, § 2–4–201(1)(c), C.R.S.2007, and courts will not interpret a statute in a manner that leads to an absurd or unreasonable result. *Wolf Creek Ski Corp.*, 170 P.3d at 826.

When interpreting tax statutes, a court should not view the power to impose taxes expansively, and should resolve doubts in favor of the taxpayer. *Ball Corp. v. Fisher*, 51 P.3d 1053, 1056 (Colo.App.2001). "The general rule, long followed in Colorado, is that the taxing power and taxing acts are construed strictly against the taxing authority and in favor of the taxpayer." *Rocky Mountain Prestress, Inc. v. Johnson*, 194 Colo. 560, 564 n. 2, 574 P.2d 88, 91 (1978) (quoting *City & County of Denver v. Sweet*, 138 Colo. 41, 52, 329 P.2d 441, 447 (1958)).

In analyzing the language of the use tax provisions here, we recognize the principle that "[u]se taxes are enacted primarily to equalize the tax burden as between those who purchase within and without the state." *Matthews v. State*, 193 Colo. 44, 47, 562 P.2d 415, 417 (1977). Here, although we are dealing with a county, rather than a state, the principle applies with equal force.

Construction of a statute by administrative officials charged with its enforcement, such as the Department of Revenue, shall be given great deference. However, administrative regulations are not absolute rules. They may not conflict with the design of the statute, and when they do, a court has a duty to invalidate them. Furthermore, when an administrative official misconstrues a statute and issues a regulation beyond the scope of a statute, its acts are in excess of the administrative authority granted. *See Travelers Indem. Co. v. Barnes*, 191 Colo. 278, 282, 552 P.2d 300, 303 (1976).

## II. "Construction and Building Materials"

The County contends that the trial court erred in holding that the equipment in dispute does not constitute "construction and building materials," as contemplated by section 29–2–109(1), and that the County's interpretation of "construction and building materials," as set forth in Rio Blanco County Resolution 81–1, exceeds in scope the intent of section 29–2–109(1). We agree with the trial court.

Section 29–2–109(1) states in relevant part:

The use tax ordinance, resolution, or proposal of any town, city, or county adopted pursuant to this article shall be imposed only for the privilege of using or consuming in the town, city, or county any construction and building materials purchased at retail or for the privilege of storing, using, or consuming in the town, city, or county any motor and other vehicles, purchased at retail on which registration is required, or both.

Subsequent to the enactment of section 29–2–109(1), the County defined "construction and building materials" as *"tangible personal property* which is stored, used or *consumed* in Rio Blanco County and which is *intended* to become a *part of, attached to,* or a *component of a building, structure,* road, or appurtenance in Rio Blanco County." Rio Blanco County Resolution 81–1, art. IV, § I(A) (1981) (emphasis added). Based upon this definition of "construction and building materials," the County imposed a use tax on equipment used in the construction and operations of mining and industrial companies.

The term "construction and building materials" is not defined by section 29–2–109(1). "Where a term 'is not defined by the statute, . . . we must assume that the General Assembly intended that th[e] phrase be given its usual and ordinary meaning.'" *Barron v. Kerr–McGee Rocky Mountain Corp.*, 181 P.3d 348, 350 (Colo.App.2007) (quoting *Enright v. City of Colorado Springs*, 716 P.2d 148, 149 (Colo.App.1985)); *see also Anderson v. M.W. Kellogg Co.*, 766 P.2d 637, 640 (Colo.1988). In determining that meaning, we must remain cognizant that tax statutes "will not be extended beyond the clear

import of the language used, nor will their operation be extended by analogy," and that "[a]ll doubts will be construed against the government and in favor of the taxpayer." *Transponder Corp. v. Prop. Tax Adm'r*, 681 P.2d 499, 504 (Colo.1984) (quoting *Associated Dry Goods Corp. v. City of Arvada*, 197 Colo. 491, 496, 593 P.2d 1375, 1378 (1979)); *accord OPEX Commc'ns, Inc. v. Prop. Tax Adm'r*, 166 P.3d 225, 227 (Colo.App.2007); *see also Sweet*, 138 Colo. at 52, 329 P.2d at 447.

We begin our analysis by looking to the common understanding of the term "construction and building materials." The word "material," when used as a noun, means "the basic matter (as metal, wood, plastic, fiber) from which the whole or the greater part of something physical (as a machine, tool, building, fabric) is made." *Webster's Third New International Dictionary* 1392 (1993). Definitions of "construction" include "the act of putting parts together to form a complete integrated object: FABRICATION" as well as "something built or erected: STRUCTURE." *Id.* at 489; *see also Padilla v. Sch. Dist. No. 1*, 25 P.3d 1176, 1182 n. 5 (Colo. 2001). Used as an adjective, "building" is "the art or business of assembling materials into a structure." *Webster's* at 489. As relevant here, "structure" is defined as "[a] ny construction, production, or piece of work artificially built up or composed of parts purposefully joined together [a building is a structure]." *Black's Law Dictionary* 1464 (8th ed.2004).

Nothing in the plain and ordinary meaning of these words suggests, as the County has concluded, that they are synonymous with all types of tangible personal property, including items which can be consumed within the county or which one might intend to attach to, or become a component part of, a completed structure or building. In our view, giving such an expanded meaning to "construction and building materials purchased at retail" would broaden the scope of section 29–2–109(1) to an unreasonable and unintended degree.

In contrast, our interpretation of the words "construction and building materials" relies upon their plain and ordinary meaning, which, as the trial court concluded, refers to materials used in creating structures that are associated with, and generally become a part of, the realty. Construction and building materials are assembled into and become part of a structure so that they lose their individual identities and take on a new composite form—that of a building or structure that is generally associated with the realty upon which it is built. *See Andrews v. Williams*, 115 Colo. 478, 481, 173 P.2d 882, 883 (1946); *see also Updegraff v. Lesem*, 15 Colo.App. 297, 306, 62 P. 342, 345 (1900) (items of mining equipment were placed upon the mining premises for the purpose of carrying on the business for which the lease was taken, that is, for the purpose of working the mine and, therefore, they were trade fixtures and not real property).

Furthermore, the General Assembly's use of the term "construction and building materials" in sections 39–26–708 and 39–26–710, C.R.S.2007, supports our interpretation. Section 39–26–708 exempts from sales and use tax "sales of construction and building materials" for use in the "building, erection, alteration, or repair of structures, highways, roads, streets, and other public works," suggesting that construction and building materials are used on structures that become a permanent part of the realty. Section 39–26–710 exempts "construction and building materials" used to construct and maintain railroad tracks, again suggesting that construction and building materials are used on structures which become a permanent part of the realty.

Here, each piece of equipment included in ExxonMobil's natural gas operation survives its use, and unlike building and construction materials which are actually transformed into a structure, it does not perish or lose its component identity when it is incorporated into, and functions with, the operating system. The items of equipment at issue here, including pipelines, holding tanks, and Christmas trees, are components of an operating system that can be permanent, but can also be disassembled and moved to a new location. The evidence in the record also demonstrates that each component of the natural gas system contains a separate tracking number. Therefore, the components of

this industrial operating system did not become such an integral part of the real property as to lose their identity as separate things and have their individual existence merged into that of the realty.

We also note that when a well site is abandoned, ExxonMobil is responsible for remediation and reclamation of the site, which involves removal of the equipment from the land and restoration of the land to its original condition. *See* Oil & Gas Conservation Comm'n Reclamation Regulations 1001(a) & 1004(a), 2 Code Colo. Regs. 404–1. This also suggests that ExxonMobil's operating system is removable and is not the kind of structure that one would typically characterize as a part of the real property where it is located.

The equipment and components in the system may be considered "personal property" or "trade fixtures" that do not become part of an improvement to real property, but frequently are, and ultimately will, be removed by ExxonMobil. "Personal property" is defined in the ad valorem tax statute as "everything that is the subject of ownership and that is not included within the term 'real property,'" including "machinery, equipment, and other articles related to a commercial or industrial operation that are either affixed or not affixed to the real property for proper utilization of such articles." § 39–1–102(11), C.R.S.2007. The definition of "personal property" further states that

> any pipeline, telecommunications line, utility line, cable television line, or other similar business asset or article installed through an easement, right-of-way, or leasehold for the purpose of commercial or industrial operation and not for the enhancement of real property shall be deemed to be personal property, including, without limitation, oil and gas distribution and transmission pipelines, gathering system pipelines, flow lines, process lines, and related water pipeline collection, transportation, and distribution systems. Structures and other buildings installed on an easement, right-of-way, or leasehold that are not specifically referenced in this subsection (11) shall be deemed to be improve-

ments pursuant to subsection (7) of this section.

*Id.* A "trade fixture" is defined as "[r]emovable personal property that a tenant attaches to leased land for business purposes, such as a display counter." *Black's Law Dictionary* 669.

The County's interpretation of "construction and building materials" is so broad that it would tax nearly every item of personal property—whether or not it was purchased at retail within or outside the county. For example, applying the County's definition, the tax would apply to all personal property whether or not it was mobile. This would include measuring equipment, tools, computers, and valves, indeed, all components of the system. Taken to its logical extreme, the County's definition would encompass property that could be consumed within the county, reaching to such items as gas flared from wells and stored saltwater. We cannot accept the County's interpretation without contorting the plain words of the statute and disregarding the requirement of construing the statute strictly against the taxing authority. Indeed, that interpretation would expand the commonly understood term "construction and building materials" to include computers, notepads, and telephones.

The County contends that all parts of ExxonMobil's system constitute an improvement to the real property and therefore the system was constructed and built with taxable materials. In support of its position, the County relies upon *Barron v. Kerr–McGee Rocky Mountain Corp.*, 181 P.3d 348 (Colo.App. 2007). There, a division of this court concluded that a storage tank became an improvement to realty for purposes of the Colorado Workers' Compensation Act and Kerr–McGee's status as an employer making repairs to its real property under section 8–41–402(1), C.R.S.2007. The division did not consider whether the storage tank was subject to a county use tax under section 29–2–109(1), and we conclude that the policy differences between the two statutory schemes are so extreme as to render the holding in *Barron v. Kerr–McGee* inapposite. We are not faced with deciding whether ExxonMobil is a statutory employer.

■ Additional factors compel our conclusion that the County's interpretation is overbroad.

· Commercial trade fixtures are an exception to the rule that whatever is annexed to the realty becomes a part of it. *Andrews*, 115 Colo. at 483, 173 P.2d at 884.

· When ExxonMobil leaves the property, it will leave nothing behind and there will be no improvement upon the property *ex ante*.

· Our conclusion is consistent with that of the Department of Revenue, to whom deference is owed.

Even if the terms used by the General Assembly were deemed ambiguous, thereby warranting reference to legislative history, the discussions surrounding the adoption of section 29–2–109(1) support our conclusion.

The testimony before the General Assembly on the original version of section 29–2–109, which provided that the use tax "of any incorporated town or city ... shall be imposed for the privilege of storing, using, or consuming in the town or city any articles of *tangible personal property* purchased at retail," H.B. 1236, 49th Gen. Assemb., 1st Sess. (1973) (emphasis added), reflects that an underlying purpose of section 29–2–109 was to equalize economic disadvantage in incorporated cities and towns caused by builders and general contractors purchasing construction and building materials in a city or town other than where they were building the house:

[The City of Louisville is] a small community located near larger communities, such as Boulder, 15 minutes away, and Denver.

And particularly with regard to construction work, it's very easy for people who are in the construction business to run over to Boulder and pay Boulder its sales tax, which is 5 from 8 from its Boulder citizens.

And ... yet in that 15 minute drive, in fact, this can be looked at as taking revenue away from it—from the community. They'd like to keep some of it there.

A building permit is issued by the City of Louisville, the construction is carried out, and all of the administrative costs are involved in, say, with regard to construction projects. And they're not able to take advantage, as a municipality, of that kind of a sale.

Hearings on H.B. 1236 before the H. Local Government Comm., 49th Gen. Assemb., 1st Sess. (May 2, 1973) (remarks of Representative Buechner).

In addition, the Loveland City Manager testified that he supported the use tax legislation as a means of protecting the city's economic base, citing the residential construction industry as the major reason:

I would say that the first reason for wanting [to enact the use tax] is building materials. The second would be automobiles, and the third would be other large commodity goods, such as furniture, appliances, this type of situation....

As far as the protection of the economic base, I've already pointed out one thing, and I'll just reiterate it, again. Building materials, automobiles, and then the other large commodity goods, furniture and appliances, is what we would be basically interested in.

Now, just to give you some examples: we have one large lumber supply dealer in the community who, in 1972, paid the community $17,059 worth of sales tax.

We also have another large lumber dealer that's right on the edge of the city, it's [a]butted by two sides of the city, ... who pays no tax to the city....

[T]hat company represents deliveries of considerable percentage into the city, for building activities going on inside the city. And so this is an economic disadvantage, and it's also an economic revenue disadvantage to the city.

A couple other examples in the building industry, we have a number of large contractors in the community. Wood Brother Homes, as an example. Virtually 100 percent of their materials are delivered from outside the city into the city for the building activity.

On a smaller note, although it represents tax dollars, we have no company in the community that makes prefab kitchen cabi-

net[s].... So 100 percent of that type of activity is brought in from outside the city.

We also have three other examples I could use. There's a number ... of businesses who, up to about a year ago, were located in the city, and then since that time have located on the periphery of the city, still oriented primarily to the Loveland market. One's an automobile dealer, one's an appliance dealer, and one is a glass dealer, and the glass basically represents the building industry, again.

*Id.* (remarks of Don Hathaway, the Loveland City Manager). There was also testimony that, in Boulder, when a building permit is "taken out" there is "about a one percent tax levied on that, which is the use tax," and that Boulder "makes about $500,000 a year off of its use tax, most of [which] is from ... home construction." *Id.* (remarks of Representative Buechner).

Finally, the chairman of the House committee expressed concern that "one of our big problems today is in housing—is in ... the high cost of housing" and stated that most of the cities and towns "recognize[ed] the growth ... and [were] looking to the construction business in order to obtain additional funds for cities through use tax," noting that the "construction industry itself ... will not be the ones who assume the costs." *Id.* (remarks of Chairman Dittemore).

Again, during the second committee hearing, which was held to vote on the proposed amendment that would restrict the right to impose a use tax on only "construction and building materials, or motor or other vehicles on which registration is required," the term "construction and building materials" was discussed solely in the context of residential construction. Hearings on H.B. 1236 before the H. Local Government Comm., 49th Gen. Assemb., 1st Sess. (May 7, 1973). For example, there was testimony that "the construction materials could be handled as a part of the building permit process at the local level." *Id.* (remarks of Representative Buechner). There were also discussions concerning whether new major appliances, such as washing machines and refrigerators, that were installed as part of the construction of a new home, or installed in pre-existing homes,

would be subject to the proposed use tax. *Id.* (remarks of Representatives Buechner and Miller). There was agreement that the former would be subject to the use tax while the latter would not, with the distinction being "[o]n the kind of things that would blend into [or become part of] the construction and building materials." *Id.* (remarks of Representative Miller).

Further indication of the meaning intended to be given by the General Assembly to the term "construction and building materials" is gleaned from the context of how the use tax would be calculated. There was testimony that the estimated use tax assessment would be based on the "total amount of building materials that were bought outside of that area," which is normally reflected on the application for a building permit. *Id.* (remarks of Representative Miller). There was also testimony that the "actual cost[s] on closing" could be used to determine the amount of the use tax to be imposed on a specific construction project (the specific example given was an apartment building), because at closing "the exact cost of the building materials" would be known. *Id.* (remarks of Representative Miller and unidentified Representative). Finally, there was testimony that the use tax was "confined to the construction and buildings trade." *Id.* (remarks of Representative Pettie).

These discussions reflect that the General Assembly intended to impose a use tax on only those construction and building materials that become permanently affixed to, completely integrated with, or a component part of, improvements to real property. There is no indication that the General Assembly intended to impose a use tax on systems used for industrial operations. The contrary construction adopted by the County does not conform to the legislative purpose of section 29–2–109(1).

Based upon our interpretation of the statute, we conclude that the trial court was correct in determining that the definition of "construction and building materials," as set forth in Rio Blanco County Resolution 81–1, and as interpreted by the County, was invalid and in determining that the equipment in

question was not subject to the County's use tax. *See Travelers Indem. Co.*, 191 Colo. at 283–84, 552 P.2d at 304.

The judgment is affirmed.

Judge VOGT and Judge LICHTENSTEIN concur.