COLORADO COURT OF APPEALS                                    **2017COA24**

Court of Appeals No. 16CA0393
Arapahoe County District Court No. 15CV31613
Honorable Charles M. Pratt, Judge

City of Aurora, Colorado, a municipal corporation; and Aurora Urban Renewal
Authority, a Colorado urban renewal authority

Plaintiffs-Appellants,

v.

Marc Scott, in his official capacity as Arapahoe County Assessor,

Defendant-Appellee.

ORDER AND JUDGMENT AFFIRMED

Division I
Opinion by JUDGE GRAHAM
Taubman and Navarro, JJ., concur

Announced February 23, 2017

Michael J. Hyman, City Attorney, Christine A. McKenney, Assistant City
Attorney, Aurora, Colorado; Hamre, Rodriguez, Ostrander & Dingess, P.C.,
Richard F. Rodriguez, Joel M. Spector, Denver, Colorado, for Plaintiffs-
Appellants

Ronald A. Carl, Arapahoe County Attorney, John R. Christofferson, Deputy
County Attorney, Benjamin P. Swartzendruber, Assistant County Attorney,
Littleton, Colorado, for Defendant-Appellee

Hall Evans, LLC, Thomas J. Lyons, Brian Molzahn, Denver, Colorado, for
Amicus Curiae Colorado Counties, Inc.

Murray Dahl Kuechenmeister & Renaud, LLP, Geoffrey T. Wilson, Denver,
Colorado, for Amicus Curiae Colorado Municipal League

Cynthia H. Coffman, Attorney General, Frederick R. Yarger, Solicitor General, Robert H. Dodd, Senior Assistant Attorney General, Denver, Colorado, for Amicus Curiae Colorado Property Tax Administrator

George Rosenberg, Littleton, Colorado for Amicus Curiae Colorado Assessors Association

¶ 1     In this case we must decide whether Colorado's Urban Renewal Law (URL), sections 31-25-101 to -116, C.R.S. 2014,[1] permits a municipality to delay the start date of a tax increment financing period used to fund a redevelopment project by writing such a delay into an urban renewal plan. We conclude that it does not and therefore affirm the district court's order and judgment.

## I.     Background

¶ 2     Under Colorado's Urban Renewal Law, a city can establish an urban renewal authority, which in cooperation with the city creates an urban renewal plan to redevelop blighted or slum areas. § 31-25-104, C.R.S. 2014. The URL authorizes the use of tax increment financing (TIF) to fund renewal projects. TIF uses recently assessed property values in an urban renewal area to establish a base tax value. § 31-25-107(9)(a), C.R.S. 2014. As property values increase above the base value, increased tax revenues are allocated to the financing of the renewal project. Those revenues are applied to the renewal fund and are used to pay

---

[1] We cite the 2014 statute throughout this opinion because it varies in some respects from the current version of the URL, due to amendments made in 2015. *See* Ch. 261, secs. 1-4, §§ 31-25-104, -107, -115, 2015 Colo. Sess. Laws 984-89; *see also* §§ 31-25-101 to -116, C.R.S. 2016.

down the debt against the project. *Id.* The statute places a twenty-five year limit on TIF allocations to a renewal fund that runs from "the effective date of adoption of such a [TIF] provision." *Id.*

¶ 3    The URL provides that a county be provided notice of the proposed plan, expected impacts on county revenues and services, and its right to submit disputes over the notice to arbitration. § 31-25-107(3.5), (12), C.R.S 2014.

¶ 4    In this case, the City of Aurora (the City) approved two urban renewal plans (collectively, the Plans) with multiple phases of redevelopment. The Fitzsimons Plan included four development phases and the plan stated that TIF would begin immediately for the first two phases but be delayed for the second two phases. The Iliff Plan included two development phases and provided for TIF to begin immediately for phase one and to be delayed for phase two.

¶ 5    After the City approved the Plans, the Arapahoe County Assessor (the Assessor), who is tasked with calculating property values for tax purposes, immediately calculated base tax values for all development phases. The City and the Aurora Urban Renewal Authority (collectively, Aurora) filed a complaint against the Assessor asking the court to order him to delay allocating TIF. The

Assessor argued that he was complying with the URL, which does not permit a city to delay the start of TIF allocations.

¶ 6     On cross-motions for determination of law, the district court entered an order in favor of the Assessor, concluding that the URL does not expressly permit the start of TIF allocations to be delayed. Because this determination of law resolved all issues in the case, the court then also entered judgment for the Assessor. Aurora then filed this appeal.

¶ 7     Aurora argues that (1) the Assessor is barred from defending himself based on his interpretation of the URL; (2) the district court misinterpreted the relevant URL provisions; and (3) the Assessor cannot rely on, and this court is not bound by, informal guidance from the Colorado Property Tax Administrator (the Administrator). We conclude that (1) the Assessor's defense is not barred; (2) the district court correctly interpreted the URL; and (3) we have not relied on the Administrator's informal guidance.

## II.     The Assessor Is Not Barred from Defending Himself Based on His Interpretation of the URL

¶ 8     We first address the threshold question of whether the Assessor's defense is barred. Although the legal basis for Aurora's

assertions is less than clear, we conclude that the doctrines of waiver, preclusion, and estoppel do not bar the defense.

### A. The Assessor Has Not Waived This Defense by Failure to Raise the Issue Earlier

¶ 9     Aurora argues that the Assessor waived his right to defend himself based on his own interpretation of the URL because he did not submit the issue to arbitration or appeal the Plans' approval via a C.R.C.P. 106(a)(4) action. We conclude that none of these contentions is correct.

¶ 10     Where the facts are undisputed, waiver is a question of law that we review de novo. *Duran v. Housing Auth. of City & Cty. of Denver*, 761 P.2d 180, 183 (Colo. 1988).

¶ 11     Waiver is the intentional relinquishment of a known right, which may be accomplished by words or conduct that clearly manifests an intent to give up that right. *Id.*

#### 1. The URL's Arbitration Procedure Does Not Apply to This Dispute

¶ 12     The Assessor has not waived his right to assert this defense by his own or Arapahoe County's (the County's) failure to arbitrate because the statutory arbitration procedure applies only to certain challenges not raised here.

4

¶ 13     Aurora argues that, under section 31-25-107(12), the County's exclusive remedy for challenging any aspect of an urban renewal plan is arbitration.  Aurora further asserts that the Assessor, as an officer of the County, is also bound by this exclusive remedy.  Therefore, Aurora contends, the County's failure to submit this question to arbitration amounts to a waiver by the Assessor of the right to defend.  We disagree that arbitration is a county's exclusive remedy for all challenges to an urban renewal plan.[2]

¶ 14     Statutory interpretation is a question of law that we review de novo.  *Bd. of Cty. Comm'rs v. ExxonMobile Oil Corp.*, 192 P.3d 582, 585 (Colo. App. 2008).  We interpret a statute as a whole giving words their plain and ordinary meanings, with the goal of effecting the legislature's intent.  *Id.*

¶ 15     Aurora's argument is based on the language of section 31-25-107(12)(f), which provides that "the arbitration process established in this subsection (12) shall be the exclusive remedy available to a county for contesting the sufficiency of compliance by

---

[2] Because we conclude that arbitration is not a county's exclusive remedy for all disputes related to an urban renewal plan, we do not address whether a county assessor is bound by a county's actions or inactions.

a governing body or an authority with the requirements of this section." § 31-25-107(12)(f), C.R.S. 2014.

¶ 16    However, Aurora takes the language of paragraph (f) out of context from the rest of subsection (12).  Subsection (12)(a) states that "the county may enforce the requirements of subparagraphs [(3.5)(a)(III), (IV), and (4)(h)] by means of the arbitration process established by this subsection (12) . . . ." § 31-25-107(12)(a).  Other parts of subsection (12) also specifically discuss noncompliance with subsections (3.5)(a)(III), (IV), and (4)(h).  *See* § 31-25-107(12)(b)(I), C.R.S. 2014 (county must state how the municipality has not complied with subsections (3.5)(a)(III), (IV), or (4)(h)); § 31-25-107(12)(c), C.R.S. 2014 (municipality has burden of proving compliance with subsections (3.5)(a)(III), (IV), and (4)(h)).  Reading subsection (12) as a whole, we conclude that the arbitration process is a county's exclusive remedy *only* with respect to challenges related to subsections (3.5)(a)(III), (IV), and (4)(h).

¶ 17    We also note that in 2015 the General Assembly amended section 31-25-107 to add subsection (9.5), which sets forth a mediation procedure to be used when cities and counties cannot agree on TIF allocations.  Ch. 261, sec. 2, § 31-25-107, 2015 Colo.

Sess. Laws 986-89; *see also* § 31-25-107(9.5).  If arbitration was intended to be a county's exclusive remedy for all disputes related to an urban renewal plan, we would expect some sort of harmonization of these conflicting provisions.  In the absence of any such reconciliation, and in light of the specific statutory references to subsections (3.5)(a)(III), (IV), and (4)(h), we conclude that the arbitration procedure is applicable only to challenges related to subsections (3.5)(a)(III), (IV), and (4)(h).

¶ 18     Because the Assessor's interpretation of subsection (9)(a) is unrelated to compliance with subsections (3.5)(a)(III), (IV), and (4)(h), the County's failure to arbitrate the TIF issue does not bar the Assessor's defense.

### 2.     Aurora Has Not Preserved Its Rule 106(a)(4) Argument

¶ 19     We do not address Aurora's argument that the Assessor waived his right to this defense by failing to file a Rule 106(a)(4) action challenging the Plans' approval, because this issue was not raised in the trial court.  *See McGihon v. Cave*, 2016 COA 78, ¶ 10 n.1 ("We do not consider arguments that were not raised in the district court.").

7

B. The Preclusion Doctrines Do Not Apply to This Case

¶ 20 Aurora also argues that the Assessor is precluded from defending this action because he should have litigated the issue in public hearings regarding the projects. To the extent that this argument suggests estoppel by issue preclusion, we reject it. The doctrines of claim preclusion and issue preclusion are inapplicable on these facts.

1. An Undecided Issue Cannot Be Precluded

¶ 21 First, the Assessor's defense is not barred by issue preclusion (collateral estoppel) because the meaning of the statute and the question of whether the City had the power to delay the start of the TIF clock was not decided during the public hearings. *See City & Cty. of Denver v. Block 173 Assocs.*, 814 P.2d 824, 831 (Colo. 1991) ("Collateral estoppel [issue preclusion] . . . only applies to issues actually litigated."). Since the City did not interpret section 31-25-107(9)(a) or decide whether the Plans complied with statutory TIF limits, there is no determination that can be deemed conclusive in this action.

## 2. The Assessor's Claim Is Not Precluded Because He Was Not a Party to the Public Hearings Regarding These Plans

¶ 22     Nor is the Assessor's defense barred by claim preclusion (res judicata) because he was not party to or in privity with a party to the public hearings in which these Plans were approved.

¶ 23     Where the facts are undisputed, claim preclusion is a question of law that we review de novo. *McGillis Inv. Co., LLP v. First Interstate Fin. Utah LLC*, 2015 COA 116, ¶ 67.

¶ 24     "Claim preclusion serves the dual purposes of protecting litigants from the burden of relitigating the same issue with the same party or his or her privy and of promoting judicial economy by preventing needless litigation." *McLane W., Inc. v. Dep't of Revenue*, 199 P.3d 752, 756 (Colo. App. 2008). Claim preclusion "bars not only the claims actually litigated in the first proceeding, but also those that could have been litigated." *Id.* The doctrine applies when "there is (1) finality of the first judgment; (2) identity of subject matter; (3) identity of claims for relief; and (4) identity of or privity between parties to the actions." *Id.*

¶ 25     Claim preclusion is inapplicable here because neither the County nor the Assessor was a party to the public hearings on

these Plans.  Neither the Assessor nor the County had any role in adopting or rejecting the Plans.  *See Bd. of Cty. Comm'rs v. City of Broomfield*, 7 P.3d 1033, 1037 (Colo. App. 1999) (holding that URL does not grant board of county commissioners any role in the approval process other than to receive notice of an urban renewal plan).

¶ 26    We also reject the assertion that because the County and Assessor had notice of the public hearings they were "parties" for the purpose of claim preclusion.  The cases cited in support of this contention deal with *issue* preclusion, not claim preclusion.  It is true that parties with notice, standing, and an opportunity to be heard may be barred from relitigating an issue that was actually decided even if they did not appear in an earlier case.  *K9Shrink, LLC v. Ridgewood Meadows Water & Homeowners Ass'n*, 278 P.3d 372, 375 (Colo. App. 2011).  However, we find no support for extending that rule to claim preclusion.  This would result in the preclusion of claims that were never decided against individuals and entities that were never party to an earlier action.  Such an application would not further the purposes of claim preclusion to

prevent relitigation of the same issues between the same parties and to promote judicial economy.

¶ 27    Since the Assessor was neither party to nor in privity with a party to the public hearings, claim preclusion cannot bar his defense now.

### C.    The Defense is Not Equitably Estopped

¶ 28    Finally, the Assessor's defense is not barred by equitable estoppel because Aurora could not have reasonably relied on the Assessor's or the County's inaction in a public hearing where the law grants them no role.  Equitable estoppel may be applied to prevent fundamental injustice when one party detrimentally changed its position in justifiable reliance on the words or conduct of the other party.  *City of Sheridan v. Keen*, 34 Colo. App. 228, 232-33, 524 P.2d 1390, 1393 (1974).  As we have explained, however, neither the Assessor nor the County played any part in the public approval process.  Therefore, we cannot conclude that the trial court erred in implicitly finding that Aurora did not detrimentally rely upon the Assessor's or County's failure to raise the issue earlier.

¶ 29     Having concluded that the Assessor's defense is not barred, we turn to the merits of the appeal.

III.    The Tax Increment Financing Provisions in These Plans Violate the Time Limit Imposed by the URL

A.    Standard of Review and Applicable Law

¶ 30     Statutory interpretation is a question of law that we review de novo. *ExxonMobile*, 192 P.3d at 585. We interpret a statute as a whole with the goal of effecting the General Assembly's intent. *Id.* We look to the plain statutory language and give words their commonly understood and accepted meanings. *Northglenn Urban Renewal Auth. v. Reyes*, 2013 COA 24, ¶ 17. We avoid interpretations that would lead to an absurd or unreasonable result. *ExxonMobile*, 192 P.3d at 586.

B.    Analysis

1.    The Plain Statutory Language Does Not Permit a Municipality to Extend the Twenty-Five Year Limit on Tax Increment Financing Provisions

¶ 31     The URL does not permit a municipality to alter or evade the twenty-five year time limit on TIF provisions by denominating parts of a plan "effective" after the plan is approved. The language Aurora cites only allows a TIF period to start running after the original plan

12

is approved when the city later approves a plan modification that includes a new TIF provision.

¶ 32    The relevant section provides that

> any urban renewal plan, as originally approved or as later modified . . . , may contain a provision that taxes . . . levied after the effective date of the approval of such urban renewal plan upon taxable property in an urban renewal area each year . . . by or for the benefit of any public body shall be divided for a period not to exceed twenty-five years after the effective date of adoption of such a provision.

§ 31-25-107(9)(a), C.R.S. 2014.

¶ 33    The parties disagree as to the meaning of "the effective date of adoption of such a provision." Aurora argues that the "effective date of adoption of such a provision" is different from the "effective date of the approval of such urban renewal plan," and allows a city to delay the "effective date of adoption of such a provision" by writing a delay into the urban renewal plan.

¶ 34    The Assessor argues that the "effective date of adoption of such a provision" is synonymous with the "effective date of the approval of such urban renewal plan," and that a city cannot delay the "effective date of adoption of such a provision" by writing a delay into the urban renewal plan.

¶ 35    Although we disagree that the "effective date of adoption of such a provision" and the "effective date of approval of such urban renewal plan" are synonymous, we conclude that in this case there was no practical difference between when the Plans were approved and when the TIF provisions were adopted.

¶ 36    First, we agree with the Assessor that "approval" and "adoption" as used in the URL are synonymous. The law does not define these terms, so we look to their commonly understood and accepted meanings. *Reyes*, ¶ 17. Black's Law Dictionary provides the following definitions:

> adoption, *n.* (14c) . . . . 5. *Parliamentary law.*
> A deliberative assembly's act of agreeing to a
> motion or the text of a resolution, order, rule,
> or other paper or proposal, or of endorsing as
> its own statement the complete contents of a
> report.
>
> . . . .
>
> approve, *vb.* (14c) 1. To give formal sanction to;
> to confirm authoritatively.  2. *Parliamentary
> law.*  To adopt.

Black's Law Dictionary 58, 123 (10th ed. 2014).  Thus, the ordinary meanings of "approval" and "adoption" are comparable when used in reference to the actions of a deliberative body, such as a

14

municipal government, to refer to acts of formal acceptance or endorsement.

¶ 37    Furthermore, the URL provides no basis for distinguishing between "adoption" and "approval." Section 31-25-107 uses the phrases "effective date of the approval" and "effective date of adoption" interchangeably to express an act of agreement or endorsement. Therefore, we conclude that there is no meaningful difference between the phrases "effective date of the approval" and "effective date of adoption" as used in the URL.

¶ 38    However, this does not end our inquiry. The difference between the relevant passages goes beyond the use of "adoption" versus "approval." Part of the statute refers to the date of approval "of such urban renewal plan," while the section at issue uses the date of adoption "of such a provision."

¶ 39    There is a difference between an urban renewal plan and a TIF provision. An urban renewal plan is a "plan . . . for an urban renewal project" that conforms to the general municipal plan and contains details for accomplishing the urban renewal project. § 31-25-103(9), C.R.S. 2014. A TIF provision is "a provision that taxes . . . shall be divided" and those taxes attributable to the urban

15

renewal project will be allocated to the urban renewal fund to pay project debts. § 31-25-107(9)(a)(I), (II), C.R.S. 2014. In essence, a TIF provision is an optional component of an urban renewal plan, while the plan itself is a mandatory, comprehensive document regarding how the area will be redeveloped.

¶ 40 We agree with Aurora that these phrases have different meanings, but that difference does not have the result Aurora urges. Instead, this language contemplates the effect of plan modifications that include TIF provisions.

¶ 41 Subsection (9)(a) provides that "any urban renewal plan, as originally approved or *as later modified . . .* , may contain a provision that taxes . . . shall be divided for a period not to exceed twenty-five years *after the effective date of adoption of such a provision.*" § 31-25-107(9)(a), C.R.S. 2014 (emphasis added). Reading the subsection as a whole, we conclude:

> (1) that a plan modification can include a TIF provision — as demonstrated by the language "any urban renewal plan . . . as later modified . . . may contain a provision that taxes . . . shall be divided";

(2) that the TIF period is limited to twenty-five years — as shown by the language "shall be divided for a period *not to exceed twenty-five years*";

(3) that the twenty-five year period begins running when the TIF provision is adopted — as shown by the language "after the effective date of adoption *of such a provision*"; and

(4) that a TIF provision is adopted on the date the plan or modification containing that provision was approved — based on the ordinary meaning of the term "adoption," which is the act of agreeing to or endorsing the relevant provision. *See* Black's Law Dictionary at 58, 123.

¶ 42     This conclusion is bolstered by considering the consequence of alternate wording. If the legislature had written "any urban renewal plan, as originally approved or as later modified, may contain a provision that taxes shall be divided for a period not to exceed twenty-five years after the effective date of adoption *of the urban renewal plan*," any TIF provisions added to a plan by a subsequent modification would necessarily be effective on the date the original plan was approved. Instead, by tying the TIF period to the provision

17

rather than the plan, the legislature has allowed for TIF provisions to run from the date a provision was approved, even if it was added to a plan later. But it is important to note that modifying an urban renewal plan involves another public approval process. *See* § 31-25-107(7), C.R.S. 2014. This language does not allow a municipality to evade the twenty-five-year time limit simply by writing an urban renewal plan that deems parts of the plan "effective" on a date years after the plan was actually approved.

¶ 43 Our interpretation is also consistent with *Reyes*. In that case, another division of this court considered when the TIF clock began running on land that was subsequently added to an urban renewal plan. *Reyes*, ¶ 24. The original plan was approved in 1992 and land was added in 2004. *Id.* at ¶¶ 2, 4. The division concluded that the city could have altered TIF timing for the newly added land because "the statutory language allows the modification to contain a TIF provision." *Id.* at ¶ 29. But because the modification did not include new TIF provisions, the newly added land was subject to the original time limits. *Id.* at ¶ 30.

¶ 44 Thus, *Reyes* similarly interpreted the "effective date of adoption of such a provision" as contemplating either the date an

18

original plan with a TIF provision or a modification containing a TIF provision was approved. Where there is no subsequent modification (as here) or a modification does not include a new TIF provision (as in *Reyes*), the TIF provision is "adopted" when the original plan was approved.

¶ 45    We reject Aurora's assertion that, under *Reyes*, a municipality's power to control the timing of an urban renewal plan under section 31-25-107(8) encompasses the power to write its own TIF timeline. Subsection (8) provides that "[u]pon the approval . . . of an urban renewal plan or a substantial modification thereof, the provisions of said plan with respect to the land area, land use, design, building requirements, timing, or procedure applicable to the property covered by said plan shall be controlling . . . ." § 31-25-107(8), C.R.S. 2014.

¶ 46    However, the authority granted by subsection (8) to control timing does not extend to setting a TIF timeline. Instead, this subsection refers to other aspects of the urban renewal plan timing, such as the timing of construction and development.

¶ 47    This interpretation is consistent with *Reyes*. Although the *Reyes* division noted that "the City Council could have altered the

timing of the TIF provision," this statement was made in the specific context of an urban renewal plan modification. *Reyes*, ¶ 29. Indeed, the division's full statement was that "the City Council could have altered the timing of the TIF provision *for the newly added properties*." *Id.* (emphasis added). The division cited the statute's modification language to support its conclusion. *Id.*

¶ 48 The *Reyes* division did not suggest that a city has the power to overrule the statutory timeline. It only concluded that, because the modification contained no new TIF provision, the newly added land was subject to the original TIF termination date, "twenty-five years from the effective date of the original TIF provision." *Id.* at ¶ 32. Thus, *Reyes* is consistent with our interpretation that the "effective date of adoption of [a TIF] provision" contemplates the date a plan or modification containing the relevant TIF provision was approved, not a date determined by the municipality.

¶ 49 Section 31-25-107(9)(a)(II) also supports the conclusion that a municipality's powers under subsection (8) do not extend to setting a TIF timeline. Subsection (9)(a)(II) requires TIF allocations to begin immediately after the effective date of approval of the urban renewal plan or modification containing the TIF provision. Under

subsection (9)(a)(I), "the taxes which are produced . . . each year by or for each such public body upon the valuation for assessment of taxable property in the urban renewal area *last certified prior to the effective date of approval of the urban renewal plan* [or modification] . . . *shall* be paid into the funds of each such public body . . . ." § 31-25-107(9)(a)(I), C.R.S. 2014 (emphasis added). And under subsection (9)(a)(II), "[t]hat portion of said property taxes . . . in excess of the amount of property taxes . . . paid into the funds of each such public body [under paragraph (I)] *shall* be allocated to and . . . paid into a special fund of the authority . . . ." § 31-25-107(9)(a)(II), C.R.S. 2014 (emphasis added). Since paragraph (I) sets the date for the base valuation ("the effective date of approval of [the] plan [or modification]") and paragraph (II) requires taxes in excess of the base valuation to be allocated to the urban renewal fund, when read together, the provisions of subsection (9)(a) require that TIF allocations begin on the effective date of approval of the urban renewal plan or modification containing the TIF provision.

¶ 50    Aurora places great weight on the words "effective date," arguing that because the General Assembly did not define the

21

"effective date of approval of [an] urban renewal plan" and the "effective date of adoption of [a TIF] provision," municipalities are empowered to define the "effective date" of such actions. However, this is contrary to well-settled rules of statutory interpretation, which require us to give words their commonly understood and accepted meanings. *See Reyes*, ¶ 17. Black's Law Dictionary defines "effective" in the context of "a statute, order, contract, etc." as "in operation at a given time." Black's Law Dictionary at 628. It defines "effective date" as "[t]he date on which a statute, contract, insurance policy, or other such instrument becomes enforceable or otherwise takes effect." *Id.* at 478. Although "[t]his date *sometimes* differs from the date on which the instrument was enacted or signed," *id.* (emphasis added), we find no support for applying a later effective date of adoption or approval here. The common understanding of the phrase "effective date of adoption of such a provision" is the date on which a provision becomes enforceable or operational through a municipality's act of formally sanctioning or agreeing to the provision. *See id.* at 58, 123, 478, 628.[3]

---

[3] Indeed, the City's own actions comport with the common understanding. The resolutions "approv[ing] and adopt[ing]" the

¶ 51    Moreover, to hold otherwise would nullify the URL's twenty-five year time limit on TIF allocations by allowing municipalities to divorce the TIF timeline from the date a TIF provision was adopted.  In an analogous case, another division of this court concluded that a town could not avoid making the findings required by section 31-25-107 by submitting an urban renewal plan to the voters for approval.  *E. Grand Cty. Sch. Dist. No. 2 v. Town of Winter Park*, 739 P.2d 862, 865-66 (Colo. App. 1987).  The court explained that "[t]o hold [that voters implicitly made the necessary findings by approving the plan] would circumvent the legislative intent underlying the statutory requirement for the specified findings."  *Id.* at 866.

¶ 52    Similarly, here, to permit a city to define the "effective date of adoption of [a TIF] provision" would effectively allow the city to circumvent statutory time limits.  The URL says that TIF cannot "exceed twenty-five years *after the effective date of adoption of such a provision.*"  § 31-25-107(9)(a), C.R.S. 2014 (emphasis added).  It does not say that "TIF allocations cannot exceed twenty-five years."

---

Plans are stamped with the "EFFECTIVE DATE[S]" on which the resolutions were passed: February 10 and April 28, 2014.

But this would be the result of Aurora's urged interpretation. Allowing a city to define the "effective date of adoption" as any convenient date, regardless of when the provision was actually approved, would divorce the TIF timeline from the date of adoption and create a TIF limit of twenty-five years from any date chosen by the municipality. The statutory language does not support such a result.

¶ 53    These Plans violate the URL requirement that TIF runs from the date of adoption because the areas where TIF is delayed are not modifications but are written into the original plans. The City formally "approv[ed] and adopt[ed]" the Plans, including the TIF provisions, on February 10 and April 28, 2014, yet the plans or resolutions state that certain provisions will not be "deemed established" until a later unspecified date.[4] This is beyond what the

---

[4] The resolution approving the Iliff Station Plan stated that "Tax Increment Area No. 1 . . . shall be deemed established upon the date of approval of [this plan]," while "Tax Increment Area No. 2 . . . shall be deemed established upon the date on which the City approves the initial site plan for the redevelopment of property located within such Tax Increment Area." The resolution approving the Fitzsimons Plan does not expressly note the TIF delay, but the plan provides that "Tax Increment Areas 1 and 2 shall be deemed established on the date of approval of this plan. With respect to Tax Increment Areas 3 and 4, the allocation of the Tax Increment shall

statute allows. Nothing in the URL authorizes a municipality or an urban renewal authority to extend the twenty-five year limit simply by deeming parts of the plan "approved" on a later date.

¶ 54 Aurora could have accomplished the results it desires by approving only the first phases of each project and later modifying the plans to include additional land subject to new TIF provisions. However, the URL does not permit Aurora to evade the twenty-five year limit by drafting its own TIF timeline. The statute is clear that TIF cannot exceed twenty-five years from the date the provision is adopted, and a city cannot extend that time limit by denominating certain provisions "effective" on a date after they are actually approved.

### 2. Aurora's Other Arguments

¶ 55 We also reject each of Aurora's remaining contentions.

#### a. Approving the Plans Was Beyond Aurora's Legislative Powers

¶ 56 Aurora argues that adopting these urban renewal plans involved legislative acts within the City's powers as a home-rule

---

commence on the Effective Date of Allocation," which is defined as "the date upon which the City approves the initial site plan for the redevelopment of property located within such Tax Increment Area . . . ."

city. We disagree. Adopting an urban renewal plan is not a legislative act, but, even if it was, approving these Plans would be outside of the City's powers because the URL must be interpreted to require the TIF period to begin running immediately upon approval of the plan or modification containing the TIF provision.

¶ 57   First, we are not persuaded that approving an urban renewal plan is a legislative act. The public approval process includes notice and an opportunity to be heard for interested individuals, involves the application of existing standards to facts developed at a hearing, and affects specific individuals (as opposed to being generally applicable public policy). These are all factors that suggest a quasi-judicial decision. *See Cherry Hills Resort Dev. Co. v. City of Cherry Hills Vill.*, 757 P.2d 622, 625-27 (Colo. 1988).

¶ 58   However, even if approving an urban renewal plan could be characterized as legislative, approving these Plans would be beyond the City's powers because the Plans conflict with the URL's TIF timeline. If a local ordinance conflicts with a state law in a matter of mixed state and local concern, the ordinance is superseded by state statute. *Webb v. City of Black Hawk*, 2013 CO 9, ¶ 16. Aurora acknowledges that urban renewal is a matter of mixed state

26

and local concern, *see Denver Urban Renewal Auth. v. Byrne*, 618 P.2d 1374, 1385 (Colo. 1980), and, as we have explained, the Plans' TIF provisions conflict with URL time limits. Therefore, even if the City's acts were legislative, they would nevertheless be invalid.

b. We Have Not Relied on Guidance from the Colorado Administrator

¶ 59 Finally, guidance from the Administrator is only entitled to persuasive weight, and we do not consider it in this case. Although guidance from the Administrator is binding on assessors, it is not binding on a reviewing court. *Huddleston v. Grand Cty. Bd. of Equalization*, 913 P.2d 15, 17 (Colo. 1996) ("[I]t is for the courts to decide issues of law and . . . reviewing courts are not bound to follow the statutory interpretations reflected in the manuals."). In this case we do not give the Administrator's guidance even persuasive weight because the statute is not subject to multiple reasonable interpretations, and, in any event, the reference manual does not offer any insight into this issue.

IV. Conclusion

¶ 60 Order and judgment affirmed.

JUDGE TAUBMAN and JUDGE NAVARRO concur.